EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* SANTOS RODRÍGUEZ MARTÍNEZ, acusado y apelante.

*Número:* CR-70-125 *Resuelto:* 19 de septiembre de 1972

806

*Rosa Nilda Ponce Cáncel,* abogada del apelante; *Gilberto Gierbolini, Procurador General,* y *Juan E. Brunet, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

El apelante fue convicto por un tribunal de derecho de asesinato en primer grado y condenado a reclusión perpetua. En apelación señala que el tribunal de instancia erró (1) al admitir en evidencia las manifestaciones extrajudiciales del

apelante y la confesión posterior hecha al fiscal y (2) al declarar culpable al apelante de asesinato en primer grado.

Los hechos pueden resumirse como sigue: El 18 de agosto de 1969 por la tarde, desapareció de su casa en el Barrio Almácigo Bajo de Yauco la niña Angelita Pacheco Vélez, de 5 años de edad. No surge de la prueba qué gestiones se hicieron ese día en su busca. El día siguiente Santiago Guardiola, Director Local de la Defensa Civil en Yauco, informó el suceso a su jefe inmediato, Ramón Valentín Cruz, Subdirector Regional de la Defensa Civil en Mayagüez.

Ramón Valentín Cruz fue al Barrio Almácigo Bajo el viernes 22—todavía no había aparecido la niña—y algunas personas en aquel lugar le indicaron que posiblemente el culpable sería Santos Rodríguez Martínez, el apelante. Como a las 6 de la tarde Valentín Cruz, Santiago Guardiola y un detective fueron en un automóvil hasta cerca de la casa del apelante. Todos se bajaron del automóvil, Guardiola vio al apelante con el cual entabló conversación y le presentó a Ramón Valentín Cruz como un funcionario de la Defensa Civil. No había policías presente en esa conversación; solamente los dos funcionarios de la Defensa Civil y el apelante. Guardiola le dijo al apelante que todo el mundo decía que él era el más sospechoso y le pidió que le relatase lo que había ocurrido. El apelante le dijo a Guardiola y a Valentín Cruz que él había enterrado a la niña y se ofreció voluntariamente a ayudar a encontrarla. Nadie intimidó ni amenazó ni utilizó violencia para con el apelante.

El apelante dirigió a los funcionarios de la Defensa Civil a un cañaveral cercano al hogar de la niña y les señaló un área donde supuestamente la había enterrado. La búsqueda resultó infructuosa. El apelante fue llevado al cuartel de la Policía pero no surge de la evidencia si estuvo o no bajo custodia preventiva esa noche del día 22. Al día siguiente, sábado 23 de agosto, se continuó la búsqueda. El apelante fue llevado al lugar de la búsqueda en un automóvil de la

Policía y allí fue retenido. El carro fue estacionado en un camino cerca del hogar de la niña y custodiado por policías para impedir que nadie se le acercara al apelante. Había alrededor de 50 personas buscando a la niña en el área que el apelante dijo que la había enterrado. Entre esas personas se encontraba Rafael Hernández Ramos, agricultor que por más de 20 años había conocido al apelante. Hernández Ramos solicitó permiso de la Policía para acercarse al apelante y preguntarle dónde había enterrado a la niña. Dijo que hacía eso porque "se hacía tarde" y porque pensó que como el apelante había sido su amigo por toda la vida era posible que él le dijese el sitio exacto en donde tenía a la niña enterrada. Le dieron a Hernández Ramos el permiso solicitado y éste luego de saludar al apelante le dijo:

"Mira, Santos, fíjate esta impaciencia, esta inquietud que hay, ya hace seis días que la madre de esa niña no duerme ni come, este, vamos a terminar con ésto, ¿por qué tú no acabas de decir adónde tienes enterrada esa niña?" T.E. pág. 190.

El apelante le contestó que no sabía el sitio exacto porque él había estado borracho y no se acordaba adónde era. Mientras el apelante conversaba con Hernández Ramos no había nadie más cerca de ellos. Poco después Binario Franceschini, maestro de obras del Municipio de Yauco y quién se encontraba allí con motivo de haber suplido picos y palas que la Policía había solicitado, previo consentimiento de la Policía, se acercó al apelante y le dio un cigarrillo que éste había pedido. Conversaron. El apelante le relató que él había estado en un estado que ni se acordaba, que había cogido la nena y la nena gritó, que cuando gritó le dio para que no gritara. Le dijo que cuando la nena gritó él le dio un golpe por el lado de la cara, que cuando vio que la nena cayó trató de cavar para enterrarla pero cuando vio que la nena se movió cogió miedo y la dejó y se fue. Franceschini le dijo que podía ser que la nena estuviese viva todavía que tratara de recordar y le señalara el sitio de los hechos. En la conversación el ape-

lante señaló hacia determinado lugar. Le dijo a Franceschini que "por Dios mirara a ver si tenían la suerte y la encontraban, que esa era su única salvación." Franceschini llamó a la gente y empezaron a buscar por el área hacia la cual el apelante había señalado. Como a la hora y media encontraron a la niña. Estaba sin vida, en el suelo y vestida, incluso con su ropa interior. No hay evidencia de que la niña fue sexualmente atacada.

Se determinó que la causa de la muerte de la niña fue la ruptura de la médula espinal, debido a la ruptura de las primeras dos vértebras cervicales que unen con el cráneo. Esta lesión fue causada por un golpe.

Al ser descubierto el cadáver el apelante fue llevado a la oficina del Fiscal Felipe Pérez Cruz en Ponce. El fiscal declaró que le tomó al apelante los datos personales, la edad, su estado civil y que entonces el apelante le manifestó que quería confesar. Declaró el fiscal que le hizo las advertencias constitucionales, que tenía derecho a estar asistido de un abogado, que si confesaba eso podía utilizarse en su contra, que si no tenía dinero se le llamaría un abogado por cuenta del Estado, que tenía derecho a llamar por teléfono a un familiar y que si declaraba su declaración sería voluntaria. Como el apelante insistió en su deseo de declarar, entonces, continuó declarando el fiscal, él trató de localizar abogados por teléfono, que era sábado después del mediodía y que consiguió al Lcdo. Clavell. El apelante y el fiscal fueron a la oficina del Lcdo. Clavell. El fiscal le explicó al Lcdo. Clavell el propósito de su visita y éste aceptó e hizo pasar al apelante a su oficina. Mientras conversaban el fiscal y la Policía esperaron afuera de la oficina. El fiscal declara que el apelante y el Lcdo. Clavell conferenciaron en privado por más de quince minutos. Luego de esa entrevista el apelante y el Lcdo. Clavell salieron de su oficina y el apelante volvió a expresar al fiscal su deseo de declarar.

En el camino de regreso a la oficina del fiscal, el apelante y el fiscal se encontraron con el Lcdo. Iván Ayala. El fiscal lo detuvo, Ayala se bajó de su automóvil, el fiscal le explicó de lo que se trataba y puso a conversar al apelante con el Lcdo. Ayala. Oyó que Ayala le hizo al apelante las advertencias legales. Ayala y el apelante conferenciaron como por cinco minutos. El apelante se reiteró en su deseo de declarar. Regresaron a la oficina del fiscal y allí éste tomó la declaración jurada del apelante.

En su declaración jurada el apelante expresa que se acercó por la parte de atrás de la casa de la nena y que le hizo señas para que ésta viniera hacia él. El apelante llevaba unos dulces. La niña fue donde el apelante, ambos caminaron por la orilla de una quebrada y al llegar a un cañaveral le dio los dulces a la niña. Luego la acostó y pasó su miembro por encima de los *panties* de la niña, los cuales cubrían los órganos genitales de ella. La niña se puso a llorar y el apelante le dio un puño. Al verla inconsciente la dejó y se fue. Luego de declarar cuando el fiscal le preguntó si deseaba añadir algo más el apelante expresó: "Bueno, que ahora me siento mucho más tranquilo."

La declaración del fiscal y la declaración del apelante son al efecto de que el apelante en ningún momento fue objeto de intimidación o de violencia. El apelante declaró que cuando él se entrevistó con el Lcdo. Clavell éste le explicó sobre su derecho a no declarar y le preguntó si le habían pegado o si lo habían amenazado, a lo cual el apelante le contestó que no, que se habían portado bien y que él "tenía que decir ésto para sentirme tranquilo." No se practicó prueba de defensa.

Como indicamos antes, en apelación el apelante señala los dos errores antes mencionados. En cuanto al primero, mediante el cual impugna la admisión en evidencia de las manifestaciones extrajudiciales del apelante y la confesión ante el fiscal, el apelante alega que fue víctima de una presión sicológica y física que hacen que sus manifestaciones a

los funcionarios de la Defensa Civil no fuesen voluntarias, y que la confesión prestada ante el fiscal, aunque cumple con las formalidades constitucionales requeridas, fue producto de las anteriores manifestaciones incriminatorias hechas a los funcionarios de la Defensa Civil y que por lo tanto debió haber sido excluida.

 Nada encontramos en la prueba que justifique concluir que las manifestaciones del apelante a los funcionarios de la Defensa Civil fueron inducidas por intimidación de clase alguna. El apelante hizo dichas manifestaciones en forma voluntaria, según se las hizo también a su antiguo amigo el testigo Hernández Ramos. Las manifestaciones voluntarias hechas a parientes, amigos o conocidos no tienen que estar precedidas de advertencias legales algunas. Véanse casos en 31 A.L.R.3rd 565, 671–672.

La confesión prestada ante el Fiscal Peréz Cruz se hizo previo el cumplimiento del requisito de hacerle al apelante las advertencias legales requeridas y no hay nada que demuestre que no fue una confesión voluntaria o que fuese producto de golpes, amenaza o engaño.

En *Boulder* v. *Holman*, 394 U.S. 478, 479 (1969), se dijo que la cuestión de si una confesión fue voluntaria o no depende de la totalidad de las circunstancias y en ese caso se concluyó que había sido voluntaria. En *Beecher* v. *Alabama*, 389 U.S. 35, 38 (1967), la confesión extrajudicial fue obtenida por la policía en circunstancias que el Tribunal Supremo de los Estados Unidos llamó coerción crasa. Ya herido el acusado, la policía le ordenó a declarar a punta de pistola. Luego, mientras estaba en el hospital bajo la influencia de sedativos, se le ordenó decir a los investigadores "lo que ellos querían saber." En esas circunstancias, la confesión no pudo prevalecer. En *Darwin* v. *Connecticut*, 391 U.S. 346 (1968), también la situación fue muy distinta al caso de autos. Allí se mantuvo al apelante incomunicado y se le denegaron sus repetidas solicitudes de comunicarse con otras personas. Su

abogado hizo sin éxito, durante tres días consecutivos, 25 llamadas telefónicas a la policía para que lo comunicaran con el acusado. En esas circunstancias la policía le extrajo una confesión al acusado la cual, desde luego, resultó inadmisible.

■ En el caso de autos las circunstancias son muy distintas. El fiscal fue solícito en extremo. Le hizo las advertencias legales, le consiguió un abogado un sábado por la tarde y ante la insistencia del apelante de confesar le procuró una conferencia con un segundo abogado. Estos abogados informaron al apelante de sus derechos y así informado el apelante insistió en declarar.

Los que redactaron las constituciones de Puerto Rico y de los Estados Unidos, ciertamente tuvieron en mente prohibir que nadie fuese *obligado* a incriminarse mediante su propio testimonio, pero no se propusieron prohibir que un delincuente confesase libre y voluntariamente su crimen haciendo así las paces con su conciencia y con la sociedad. Esas dos constituciones tienen como uno de sus objetivos proteger la libertad de la conciencia de los seres humanos, no encadenarlas al mal. Dichas constituciones no exigen que una persona que ha llegado a ser delincuente está además obligada a ser mentiroso o perjuro toda su vida. Lo ético es decir la verdad aunque eso resulte amargo. La constitución no está reñida con la ética. Entendemos que el primer error señalado no se cometió.

■ Mediante el segundo señalamiento se sostiene que el tribunal de instancia erró al declarar culpable al apelante de asesinato. en primer grado. Este error se cometió. No hay duda de que se trata de un asesinato pero la prueba no demuestra que el mismo se llevase a cabo deliberada y premeditadamente. La prueba sí demuestra (llevar los dulces, ir a buscar a la niña a su casa, etc.) que hubo premeditación y deliberación para cometer una violación al Art. 260 del Có-

digo Penal, 33 L.P.R.A. sec. 966, el cual consiste en cometer actos lascivos con un menor de 14 años. La muerte ocurrió debido al golpe que le dio el apelante a la niña cuando ésta se puso a llorar, probablemente por miedo. Cuando la niña, ya inconsciente en el suelo, se movió el apelante cogió miedo y huyó. Si hubiese tenido la intención deliberada de matarla allí lo hubiese hecho en vez de huir y dejarla allí, posiblemente con vida.

En vista de la conclusión a que hemos llegado sobre este segundo error, *la sentencia dictada en este caso deberá modificarse en el sentido de declarar al apelante culpable de asesinato en segundo grado y de imponerle una penalidad de presidio de 12 a 20 años, y así modificada deberá confirmarse.*