EL PUEBLO DE PUERTO RICO, apelado, *v.* SANTOS SANTIAGO SÁNCHEZ, acusado y apelante.

*Número:* CR-79-65      *Resuelto:* 25 de junio de 1981

*Miguel A. Cochran Acosta,* abogado del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Marta Quiñones, Procuradora General Auxiliar,* abogados de El Pueblo.

SENTENCIA

Por hallarse el Tribunal igualmente dividido, se confirma la sentencia apelada.

El Juez Asociado Señor Díaz Cruz emitió opinión a la que se unen los Jueces Asociados Señores Rigau, Martín y Negrón García.

El Juez Asociado Señor Dávila emitió opinión a la que se unen el Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Torres Rigual e Irizarry Yunqué.

Así lo pronunció y manda el Tribunal y certifica el Secretario.

(Fdo.) Ernesto L. Chiesa
*Secretario*

—O—

Opinión emitida por el Juez Asociado Señor Díaz Cruz a

la que se unen los Jueces Asociados Señores Rigau, Martín y Negrón García.

San Juan, Puerto Rico, a 25 de junio de 1981

El apelante Santiago Sánchez, conocido por Poty, para el 20 mayo, 1978 trabajaba en el negocio de bebidas y alimentos de su abuelo Antonio Hernández quien vivía en el Callejón Hormigueros #25 interior, de Ponce. El negocio estaba en la Calle 25 de Enero en el inmediato vecindario del Callejón a *"dos minutos*, caminando a pie" (E.N.P., pág. 5) de la casa donde se perpetraron un robo y asesinato. Don Bartolomé Díaz era huésped del matrimonio Carmelo López y Paula Castro en la casa de éstos en Callejón Hormigueros #27, quienes después del almuerzo, como habitualmente lo hacían, habían salido a coger aire por los alrededores cuando a las 4:30 P.M. don Carmelo oyó a los vecinos gritando "mataron a don Carmelo".

Corrió a su casa y encontró a su huésped don Bartolomé muerto, tendido en el piso en un charco de sangre, con una herida honda que penetró el rostro por la boca y se extendía de oreja a oreja, y junto al cadáver un machete (perrillo) de la casa y un cuchillo doblado. Encontró el ropero forzado y desaparecidos los $4,500 que allí guardaba.

La investigación se concentró en el vecino inmediato de don Carmelo, el cantinero Antonio Hernández y otro nieto suyo y hermano del apelante llamado Fernando Luis Santiago a quienes interrogaron en el cuartel de policía sin mayor consecuencia, cuando el agente Pedro J. León recibió una confidencia indicándole que quien había matado al viejito no era Fernando Luis, sino su hermano Santos alias Poty, el apelante. Llevado éste junto a su hermano y abuelo al cuartel, confesó el delito así:

[Luego de las advertencias] Que estaba en el negocio de la esquina dándose un trago y esperó a que don Carmelo López, el dueño de la casa donde ocurrieron los hechos, llegara al sitio donde acostumbraba ir todos los días a coger fresco y, al verlo llegar allí, se fue a la casa de don Carmelo

con el propósito de llevarse un dinero que éste tenía guardado, y que cuando el difunto (don Bartolomé) notó la presencia del acusado, le hizo frente y éste le dijo: "Esto es un asalto, quédate quieto, que yo lo que quiero son los chavos." (E.N.P., pág. 3.) El acusado encontró un machete y con el mismo la emprendió a tajos contra don Bartolomé. Luego de darle un golpe y dejarlo inconsciente entró al cuarto y allí con un cuchillo forzó el candado de la cajita y se llevó el dinero hasta un solar cercano; se escondió en una casa grande del vecindario y al anochecer se fue para su casa. (E.N.P., pág. 2.)

Convicto el acusado por delito de asesinato en primer grado, en su alegato de apelación abandonó la defensa de coartada de la que dependió en el juicio, y señala como errores únicamente: 1° haber el tribunal admitido el testimonio del policía Pedro J. León sin haber éste hecho al sospechoso todas [1] las advertencias *Miranda;* y 2° haberse admitido una confesión que no fue voluntaria, ni "rodeada de las garantías que exige la Ley para no incriminarse".

Fuera de todo señalamiento y argumento en el alegato del apelante aparecen el aspecto de *corroboración* de la confesión y el de *duda razonable* que resultan originados en la opinión del otro lado.

El juez de instancia, señor Cintrón García, constituido en tribunal de Derecho por mediar renuncia al jurado, no creyó que el acusado solicitara hablar con abogado mientras se hallaba bajo custodia en el cuartel de policía, como tampoco le mereció crédito su reclamación de que la confesión le fue extraída por castigo o tortura. Su adjudicación de credibilidad es intocable en apelación, por estar bien fundada en la prueba que en lo relevante a esta cuestión fue la siguiente: al tiempo de la confesión el detenido no estaba incomunicado, ni aislado en confrontación exclusiva con policías; allí estaban su hermano y su abue-

---

[1] Su posición se reduce a que si bien fue advertido de su derecho a consultar abogado, no se le dijo que si no podía contratarlo, el Estado le proveería uno. Como se verá, el apelante no mostró interés alguno en abogado, y así lo adjudicó el juez al dirimir credibilidad.

lo. De los dos el único que habló de un supuesto "maltrato" del acusado por los policías, sin más especificación, fue el hermano Fernando, que no substanció su cargo más allá de decir que "frente a su abuelo le empezaron a decir cosas al acusado como por ejemplo, que si no le daba vergüenza tener un hermano como el testigo . . .". (E.N.P., pág. 6.) En su testimonio prejuiciado llega al punto de omitir toda mención de la confesión hecha por su hermano: "Escuchó cuando interrogaban a su hermano, diciéndole que él sabía de lo ocurrido y su hermano les contestaba que él no sabía nada." (E.N.P., pág. 6.) La misma reticiencia en cuanto a que hubiera una confesión, siquiera forzada, aparece en el testimonio en juicio del acusado, que en abierta disparidad con los testimonios de su abuelo y de su hermano, (²) declaró que "los agentes empezaron a golpearlo". (E.N.P., pág. 9.) Esta misma persona, que se muestra tan enterado y presto a defender su derecho como ha de deducirse de su alegación de que pidió permiso en el cuartel para hablar con su abogado señor Héctor Martínez Colón y que quería hablar con el Juez señor Rodríguez Bou a quien le fue sometido el caso para determinación de causa (E.N.P., pág. 9) nada dijo a dicho magistrado del maltrato y opresión a que lo habían sometido, a pesar de que seguía acompañado de su hermano y con entera libertad de movimiento, sin restricción alguna para revelar al juez instructor lo que acababa de pasar. Al negar aun que su hermano fuera llevado ante el juez, el testigo hermano declaro que "los agentes se apearon y dejaron a su hermano dentro del carro y no lo dejaron hablar con el Juez". (E.N.P., pág. 6.) La considerable difusión y penetración en la conciencia popular de los derechos fundamentales en la sociedad puertorriqueña de esta década final del siglo XX

---

(²) El abuelo, un bodeguero de 69 años, limitó su imputación de maltrato a una advertencia de la Policía dirigida a él y a sus dos nietos (uno de ellos el apelante) de que si el acusado no decía lo sucedido los iban a meter presos a todos. (E.N.P., pág. 7.) No mencionó golpes ni torturas.

excluyen absolutamente la posibilidad de que un hombre obligado a confesar a golpes un asesinato y robo del que dice no saber nada porque "se encontraba trabajando en el negocio de su abuelo" (E.N.P., pág. 9), se mantenga quieto, acompañado de su hermano, frente a la casa del juez, sin tan siquiera moverse para reclamar su inocencia y formular cargo a sus acusadores. No podía merecer crédito su impugnación de la confesión, frente al testimonio del agente Pedro J. León quien relató cómo al principio hubo de descartar al hermano del apelante como sospechoso; que al centralizar la investigación en el apelante le hizo las advertencias *Miranda* y que éste confesó limpia y voluntariamente sin que en momento alguno mostrara interés en comunicarse con un abogado, ni que se le prohibiera usar el teléfono para tal propósito. El juez de derecho, preferido al jurado por el acusado, simplemente resolvió el conflicto de credibilidad que hemos esbozado, y no vemos cómo pudiera ningún juzgador imparcial sin ánimo prevenido llegar a otra conclusión que la del Tribunal Superior de Ponce.

Con hechos tan categóricos y tan correctmente adjudicados el recurso a jurisprudencia en torno a las advertencias *Miranda* es pura faena escolástica. El juez quedó satisfecho de la suficiencia de las advertencias hechas al detenido por el policía León, oídas las cuales manifestó el acusado que "no había problema y procedió a hacer su confesión voluntariamente". (E.N.P., pág. 3.) Una buena parte adjetiva de *Miranda* v. *Arizona*, 384 U.S. 436 (1966), es obsoleta, y ha sufrido extensa poda aquel exceso de protección contra el cual tenía que luchar el acusado que voluntariamente quería descargar su conciencia.

Los que redactaron las constituciones de Puerto Rico y de los Estados Unidos, ciertamente tuvieron en mente prohibir que nadie fuese *obligado* a incriminarse mediante su propio testimonio, pero no se propusieron prohibir que un delincuente confesase libre y voluntariamente su crimen haciendo

así las paces con su conciencia y con la sociedad. Esas dos constituciones tienen como uno de sus objetivos proteger la libertad de la conciencia de los seres humanos, no encadenarlas al mal. Dichas constituciones no exigen que una persona que ha llegado a ser delincuente está además obligada a ser mentiroso o perjuro toda su vida. Lo ético es decir la verdad aunque eso resulte amargo. La constitución no está reñida con la ética. Entendemos que el primer error señalado no se cometió. (Énfasis en el original.) *Pueblo* v. *Rodríguez Martínez,* 100 D.P.R. 805–812 (1972).

El Tribunal Supremo de los Estados Unidos se halla en franca revaloración de *Miranda* v. *Arizona,* supra, apartándose de la virtualidad que pueda atribuirse a la lectura de una tarjeta con las advertencias numeradas y reivindicando la doctrina y su cumplimiento en una conjugación con las condiciones del detenido y las circunstancias peculiares del caso. En su más reciente decisión de *Rhode Island* v. *Innis,* 446 U.S. 291 (1980), advertido el sospechoso bajo custodia de sus derechos *Miranda,* [3] manifestó que deseaba hablar con un abogado y mientras era conducido en un vehículo "jaula" al cuartel de policía reaccionó a una conversación entre los policías y les pidió que regresaran al sitio del arresto donde les mostró escondida la escopeta con que había dado muerte a su víctima. Al sostener la admisión en evidencia del arma así obtenida, concluye el Supremo federal que el interrogatorio o la "sutil compulsión" no viola la regla de *Miranda* v. *Arizona,* supra, si no va acompañado por una noción o entendimiento por la Policía de que sus palabras o acciones "con razonable probabilidad extraerían una respuesta incriminatoria". *Innis* exige un nuevo elemento para que se considere violada la garantía contra autoincriminación en el interrogatorio bajo custodia: que el récord demuestre que el detenido era "particularmente susceptible a una apelación a su conciencia" y que los policías debían saber que

---

[3] El texto de *Innis,* supra, se refiere a dichas advertencias como *"so called Miranda rights".*

esa condición resultaría en la respuesta incriminatoria. La norma de *Miranda*, ha sido suplantada por una abstracción subjetiva que la remite al campo de la especulación, y así lo reconoce el Juez Presidente Burger al concurrir en el resultado, pág. 304: "[La decisión] introduce nuevos elementos de incertidumbre; bajo la comprobación (*test*) de la Corte, un oficial de Policía en el breve tiempo disponible, aparentemente debe evaluar la sugestibilidad y susceptibilidad del acusado. . . . Pocos, si algunos, miembros de la Policía son aptos para hacer el tipo de evaluación que se contempla; hasta un siquiatra de quien se pida un criterio pericial sobre estos aspectos de un sospechoso en custodia con toda probabilidad utilizaría interrogatorio y observación extensos para formar el juicio ahora encomendado a agentes de la Policía." Hace tiempo que una confesión no admisible por falta total de advertencias puede utilizarse por el Estado para impugnar el testimonio en juicio del acusado (*Harris* v. *New York*, 401 U.S. 222 (1971)); ya se ha condicionado la definición de interrogatorio bajo custodia (*Rhode Island* v. *Innis*, supra); y en la apreciación general de las circunstancias del caso el derecho a estar asistido de abogado puede tenerse por renunciado aun en ausencia de una renuncia explícita, oral o escrita. *North Carolina* v. *Butler*, 441 U.S. 369 (1979). En este último caso, de total aplicación al de autos, se dijo:

> Una renuncia expresa, escrita u oral del derecho a permanecer callado o a consultar abogado usualmente es prueba fuerte de la validez de esa renuncia, pero no es inevitablemente necesaria o suficiente para probar la renuncia. La cuestión no es una de forma, sino más bien si el acusado de hecho, a sabiendas y voluntariamente, renunció a los derechos trazados en el caso de *Miranda*. Como se dijo inequívocamente en *Miranda*, el mero silencio no es suficiente. No significa ello que el silencio del acusado, acompañado de una comprensión de sus derechos y un curso de conducta indicativo de renuncia, nunca pueda sostener la conclusión de que

el acusado ha renunciado a sus derechos. Los tribunales han de presumir que el acusado no renunció a sus derechos; la carga del Fiscal es grande; pero al menos en algunos casos la renuncia puede inferirse claramente de los actos y expresiones de la persona interrogada.

. . . No hay duda de que este acusado fue adecuada y efectivamente advertido de sus derechos. Lo único que se cuestiona es si renunció al ejercicio de uno de esos derechos: el derecho a tener un abogado a su lado. Ni la corte del estado ni el apelado [acusado convicto] ha ofrecido razón por la que la contestación a esa pregunta deba ser negativa en ausencia de una renuncia *expresa*. [Énfasis del texto.] No es éste el primer caso criminal que cuestiona si el acusado renunció a sus derechos constitucionales. Este es asunto con el que han de ocuparse los tribunales reiteradamente. Aun cuando está envuelto un derecho tan fundamental como el de asistencia legal en el juicio, la cuestión de renuncia deberá determinarse sobre "los hechos y circunstancias particulares que rodean el caso, incluyendo los antecedentes, experiencia y conducta del acusado." [*Johnson* v. *Zerbst*, 304 U.S. 458, 464 y otras citas.]

No vemos razón para descartar ese estándar y sustituirlo con una regla inflexible *per se* en un caso como éste. Como se ha dicho al principio de esta opinión, surge que toda corte que ha considerado esta cuestión ha llegado a la misma conclusión. Diez de las once Cortes de Apelaciones de los Estados Unidos, y las cortes de por los menos 17 estados, han resuelto que una declaración explícita de renuncia no es invariablemente necesaria para sostener una determinación de que el acusado renunció a su derecho a guardar silencio o el derecho a consejo de abogado garantizados por la decisión en *Miranda*. Al crear una regla inflexible de que nunca será suficiente la renuncia implícita, la Corte Suprema de Carolina del Norte ha ido más allá de los requisitos del Derecho orgánico federal. (Págs. 373–376.)

El apelante demostró estar familiarizado plenamente con su derecho a abogado, y su conducta fue de renuncia y falta de interés en asistencia legal.

En breve *per curiam* en *Tague* v. *Louisiana*, 444 U.S. 469 (1980), gobierna hechos distintos a los del presente caso: en la vista sobre supresión de evidencia el agente que

practicó el arresto declaró que leyó las advertencias *Miranda* al acusado de una tarjeta, que no recordaba los derechos allí informados, que no recordaba haber preguntado al detenido si había entendido el contenido de la lectura, y que no podía "contestar sí o no" en cuanto a haber comprobado de algún modo si el acusado sabía leer y escribir o si tenía otros medios de conocer sus derechos. El Supremo federal resolvió, citando de *North Carolina* v. *Butler*, ante, que en tales circunstancias no podía inferirse la renuncia de derechos. Contrario a *Tague*, supra, y en armonía con *Butler*, supra, en el caso que nos ocupa el oficial de Policía que arrestó al apelante cumplimentó las advertencias *Miranda*, según el récord que dice:

En el trayecto hacia el cuartel no se habló nada pero, una vez en el cuartel, como ya Poty [el apelante] era sospechoso del asesinato cometido, el testigo procedió a hacerle todas las advertencias de ley, manifestando lo siguiente: "Santos, en estos momentos te voy a hacer unas advertencias a ti como sospechoso en el caso del asesinato de Don Bartolomé". Ahí mismo, dijo el agente, procedió a explicarle al acusado que él tenía unos derechos constitucionales que eran: Derecho a permanecer callado, derecho a estar asistido de un abogado, que si hablaba algo en ese momento se podría luego usar en su contra, que podía estar representado tanto por un abogado como por el familiar más cercano y que el acusado le dijo entonces que no había problema y procedió a hacer su confesión voluntariamente. (E.N.P., pág. 3.)

Esta resulta ser una segunda referencia a las advertencias porque ya antes a la pág. 2. E.N.P. había declarado el testigo que "hizo al acusado *todas* las advertencias de los derechos que el acusado tenía y que luego de las advertencias, el acusado hizo una confesión . . .". La Sala de Ponce, en posición excepcional para decidir entre el testimonio del agente León y la inverosímil y evasiva conducta del acusado, determinó que las advertencias hechas cumplían con las normas *Miranda* y el récord sostiene su conclusión. La decisión en este campo debe fundarse en una aprecia-

ción integral de todos los factores, tanto subjetivos como objetivos, y dejar satisfecha la conciencia del juzgador de hechos de que el acusado no fue ni obligado por el temor o la fuerza, ni inducido por estratagemas reprobables a ser testigo contra sí mismo. Ese es el fundamento de respetabilidad del fallo de instancia en el presente caso.

Hay fuerte corroboración(4) de la confesión en el resumen de la prueba:

1) La vivienda del abuelo casi contigua al hogar de la víctima y el negocio en el inmediato vecindario le permitieron el apelante conocer los hábitos del dueño de la casa (en la confesión dijo que esperó a que don Carmelo saliera a coger fresco, como era su costumbre, coincidiendo en lo declarado por éste); le permitieron enterarse del dinero guardado. Declara el confeso que en la casa encontró un machete que hundió en el cráneo de su víctima; el machete fue ocupado y don Carmelo lo identificó como suyo; confesó que había utilizado un cuchillo para forzar la cajita donde estaba el dinero, y apareció un cuchillo doblado, además del perrillo, junto al cadáver. Todos estos elementos de evidencia sustancial independiente apuntalan la veracidad de las admisiones y satisfacen la regla de *Pueblo* v. *Pérez Fernández*, 95 D.P.R. 919, 922 (1968):

> Lo que se requiere es que El Pueblo traiga evidencia sustancial independiente que tienda a establecer la veracidad de las admisiones.

*Pérez Fernández* confirmó a *Pueblo* v. *Campos Suárez*, 86 D.P.R. 310 (1962), donde la prueba de corroboración considerada suficiente fue la siguiente:

> [E]l policía que investigó los hechos, *único testigo* de cargo, declaró que diez minutos antes del accidente él había visto al acusado en otro sitio del pueblo junto al mismo ve-

---

(4) La voluntariedad y corroboración de la confesión, única prueba del Estado, tuvieron la aprobación de cuatro jueces: el juez instructor, que encontró causa, el que presidió la vista preliminar, el que presidió en alzada, y finalmente el juez a quien el acusado se sometió como tribunal de derecho.

hículo, luego lo vio en el sitio del accidente junto al vehículo y allí fue que le hizo la admisión [de que él lo manejaba]. *Pueblo* v. *Pérez Fernández,* pág. 923. (Énfasis nuestro.)

La prueba de corroboración en *Campos Suárez* producida por el único testigo policía, resulta irrisoria comparada con la del presente caso, sostenida por elementos objetivos: machete, cuchillo doblado, ropero y cajita forzados con cuchillo, convivencia en el vecindario del occiso, hábitos de vida del dueño de la casa conocidos por el acusado, y confidencia. La disidencia le niega valor a la prueba objetiva más confiable y de superior calidad, añadiendo que solo aceptaría la corroboración si el agente y el acusado hubiesen coincidido en la descripción del sitio y posición de la víctima. Esta aseveración se derrota a sí misma.

Los detalles de prueba que un tanto rezagados (últimas dos páginas) menciona la disidencia: que el agente no prestó declaración jurada; que no llevaron al acusado a un fiscal a repetir la confesión; que el dinero no apareció en el sitio donde el acusado lo guardó (desde los tiempos de Silas Marner hay mirones que le llevan el dinero a quien lo esconde); que el bebedor de cerveza y la vecina de frente a la cantina sostuvieron la coartada; que se tomaron huellas digitales sin que se presentaran en evidencia (¿pudieron revelarlas? ¿por qué no las pidió el apelante?); que una señora le dijo al guardia León que vio salir de la casa una persona con afro y pantalla, no constituían evidencia indispensable, y son todos detalles que necesariamente consideró el juez sentenciador al adjudicar credibilidad y su decisión que descansa como hemos visto, en la más convincente prueba de culpabilidad que es la confesión corroborada con elementos objetivos, es intocable. Poca fe hay en una opinión disidente asida a prueba que no mereció crédito al juzgador, para proponer la revocación sobre un señalamiento de *duda razonable* abandonado por el apelante.

La evolución que hemos señalado en la doctrina de

*Miranda* v. *Arizona*, supra, es típica de la función *mutatis mutandis* de la jurisprudencia, en este caso la norteamericana, que en ocasiones restringe y en otras expande el concepto de debido proceso respondiendo a la realidad del momento y circunstancia al interpretar una Constitución que no es pieza de museo, sino organismo vivo que ha afirmado su permanencia precisamente por la flexibilidad y adaptación, en progresiva infusión de contemporaneidad provista por las decisiones del Tribunal Supremo de los Estados Unidos.

En el presente caso, en que como hemos demostrado, un juez constituido en tribunal de derecho concluyó y adjudicó que estaban satisfechas las exigencias de las advertencias *Miranda*, ninguna razón existe para ir en pos de inquietudes académicas en operación que no tendría otro efecto que echar a la calle una persona que bajo las normas de raciocinio, de lógica, de máxima garantía de los derechos fundamentales del hombre, por su propia confesión *corroborada* ha admitido su "falta". El Tribunal Supremo de Puerto Rico es uno de apelación que no debe anular el criterio del juez de instancia, en superior posición para adjudicar credibilidad, cuando el récord descubre una cabal observancia del debido proceso de ley. No estamos aquí para sentarnos como juez de primera instancia en un nuevo juicio del acusado. Nuestra jurisdicción y encomienda apelativa termina en el hallazgo de debido proceso de ley en instancia. ¿Hay algo en la consideración integral de este caso que mueva nuestra conciencia hacia la determinación de que se ha castigado a un inocente? No hay uno de nosotros por educación y principalmente por reverencia a la justo, que estuviese inclinado a confirmar una sentencia condenatoria dictada en circunstancias que "estremezca[n] el sentido básico de justicia". *Pueblo* v. *Díaz Ríos*, 107 D.P.R. 140, 143 (1978). La voluntaria y limpia confesión del acusado, corroborada por elementos objetivos de prueba en forma que desplaza cual-

quier duda respecto a la comisión de este asesinato motivado por robo, predomina sobre cualquier sutileza que pueda promoverse contra el fallo de culpabilidad. No hay práctica que dañe más el concepto público de la justicia que el énfasis exagerado en detalles procesales secundarios resultante en la impunidad de quien ha confesado su crimen.

La sentencia, depurada en los estadios de nuestro ampuloso procedimiento criminal por el rigor crítico de cuatro distintos jueces, será confirmada.

—O—

Opinión del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 25 de junio de 1981

Sobre este caso deseo expresar tres reflexiones.

La primera consiste en que la jurisprudencia estadounidense no está confeccionada como un traje hecho a la medida para Puerto Rico. Se trata de dos sociedades distintas con dos historias y raíces distintas. En Puerto Rico, todavía, gran parte de la población vive con la idea de que la ley y la libertad ordenada son "el enemigo" y que la Gloria está representada por la sociedad que describe la literatura picaresca española del siglo XVII.

En segundo lugar, no creo que haya nada ni en la Constitución de Puerto Rico ni en la de los Estados Unidos que se oponga a que la moral y la ética sean compatibles con la ley y con el debido procedimiento. Es más, creo que esos documentos favorecen la realización de la moral y la ética en las sociedades para las cuales fueron escritos. En apoyo de lo antes dicho remito al lector a los preámbulos de ambas constituciones. Esos valores son compatibles con el Derecho y no son necesariamente incompatibles con el debido procedimiento de ley.

La tercera reflexión que quiero hacer sobre el particular es que cuando un hombre ha delinquido y luego desea confesar *voluntariamente*, ya él mismo ha dado un paso

más grande hacia su propia rehabilitación y hacia el respeto a sí mismo que lo que pueden hacer todos los presidios y todas las cárceles de Puerto Rico. No veo por qué la jurisprudencia debe negarle a un hombre que se rehabilite, sobre todo cuando sabemos que las cárceles no rehabilitan. A quien quiere la salvación moral debe dársele la oportunidad de que la logre. Estimo que no es un debido procedimiento, sino un mal procedimiento el que impide o dificulta dicha salvación. Precisamente en momentos de crisis moral y jurídica como los que vivimos es necesario volver a los valores fundamentales encarnados en la Constitución y en las mejores actitudes y tradiciones del cuerpo social.

Aunque no viene al caso, pero para no dejar un concepto incompleto y que se preste a dudas, reitero que mi posición es que aunque los presidios no rehabilitan a nadie, no importa los poemas que sobre el particular se escriban, el Derecho penal se justifica porque es un disuasivo. Eso lo tienen probado hasta la saciedad la historia y la experiencia humana.

—O—

Opinión del Juez Asociado Señor Dávila a la cual se unen el Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Torres Rigual e Irizarry Yunqué.

San Juan, Puerto Rico, a 25 de junio de 1981

Suscribí el disenso emitido en *Pueblo* v. *Nieves Ramos*, 101 D.P.R. 531, 539–541 (1973), que recoge conceptos aplicables al presente caso:

Al confirmar esta sentencia estamos devolviendo las garantías constitucionales fundamentales del procedimiento criminal a un escritorio de fiscalía, consumando un retroceso en la dirección inquisitorial del "star chamber". . . . El fiscal le habla de un derecho a declarar o a no declarar, y a tener abogado, en un léxico que difícilmente podía llevar al individuo el concepto de lo que estaba renunciando. Las

advertencias héchasle no pasaron de ser una fórmula intrascendente. . . .

El fiscal es una parte adversaria, claramente identificado con un lado; es un esforzado competidor en la valla donde se juega la libertad de un hombre. Esa realidad hizo que se le privara hace años de sus anteriores facultades para ordenar arrestos, fijar fianza, determinar causa probable, y ordenar archivo de casos. Si se le ha quitado poder para ordenar un arresto o graduar una fianza ¿se le va a permitir que tome a solas una confesión y haga del juicio una tragicomedia? . . .

No es la simple oferta de abogado sino la presencia y la participación cabal y efectiva de éste en los pasos conducentes a la confesión lo que haría ésta admisible sin dejar en nuestra conciencia la insatisfacción que se deriva de este caso. Habiendo tanto abogado dispuesto a auxiliar a un acusado en su confrontamiento con los expertos en la ley y el procedimiento criminal la dignidad de nuestro proceso criminal bien merece que erradiquemos definitivamente la farsa de confesiones "voluntarias y espontáneas" sin asistencia legal.

Peca de inconsistente el criterio de la mayoría, pues mientras nos esmeramos con extremado escrúpulo para cerciorarnos de la renuncia espontánea e inteligente al juicio por jurado por parte de un acusado que ya ha tenido el beneficio del consejo y asesoramiento de un defensor de alta idoneidad, y también revisamos con puntillosa exigencia las expresiones del juez en sus instrucciones y su intervención en el examen de testigos, guardamos la acción depuradora ante una confesión tomada sin asistencia legal aun cuando ésta tiene una consecuencia incomparablemente mayor en el resultado del juicio y en la garantía de libertad del individuo para cuya preservación existe el debido proceso de ley. Volveremos al método fácil de encaminar la investigación hacia el logro de una confesión, que es el método inquisitorial más cómodo, y una vez lograda, el juicio será un auto sacramental.

La sentencia está fatalmente viciada y teñida por la confesión obtenida bajo las circunstancias que se indican por lo que ha debido revocarse y concederse un nuevo juicio.

Hoy los ratifico con mayor vehemencia. Mientras nuestra juventud se ha inmolado en guerras para defender las li-

bertades que disfrutamos, los que tenemos la responsabilidad de hacerlas valer las sacrificamos en aras de sostener una sentencia que lo único que establece más allá de toda duda razonable es la ineficiencia de la investigación que se llevó a cabo para sostener la acusación. Como si la encarcelación de unos cuantos a espaldas del debido proceso de ley fuera a resolver el problema de la delincuencia. No puedo estar de acuerdo.

Veamos lo ocurrido en el presente caso en relación con las advertencias que se hicieron al apelante, según surge de la transcripción de evidencia, págs. 1–2:

*Agente Pedro Juan León Declara*

En la oficina después que le cojo los datos personales de él, yo le digo; Santos, en estos momentos yo te voy hacer a tí unas advertencias como sospechoso en un caso de asesinato de Don Bartolo y te explico que tú tienes unos derechos 'constitucionales', que son derecho a permanecer callado, derecho de estar asistido de un abogado, que si habla algo en estos momentos se puede usar en su contra, que puede estar representado, tanto de su abogado, como de familiares más cercanos."

"Y él me contestó . . . dice no hay problemas está bien. Yo le digo si en estos momentos tú quieres explicarme a mí alguna situación que tú hayas pasado y empiezo a explicarle que en algún momento específico a uno le puede suceder algo, o alguna situación donde uno no quiere llegar, pero que por algunos motivos uno ha llegado, pero, que llega el momento en que uno se arrepiente y que cree que hablando con otra persona pueda desahogarse . . . , sentirse mejor."

Es obvio que estas advertencias no cumplen con los requisitos que se han establecido en nuestros dictámenes y en los del Tribunal Supremo de los Estados Unidos. Véase *Miranda* v. *Arizona*, 384 U.S. 436 (1966); *Orozco* v. *Texas*, 394 U.S. 324 (1969); *Mathis* v. *United States*, 391 U.S. 1 (1968); *Pueblo* v. *Tribunal Superior*, 97 D.P.R. 199 (1969). Señalamos en *Pueblo* v. *Guadalupe Rosa*, 94 D.P.R. 190, 195 (1967), lo siguiente:

Ahora bien, no es suficiente advertencia para proteger el derecho del acusado a no incriminarse que se le informa de su derecho a consultar con abogado antes de declarar y a tener asistencia de abogado durante el interrogatorio. *Es necesario además que se le informe de su derecho a ser provisto de asistencia de abogado en caso de que no esté en condición de contratar o procurarse los servicios de uno.*

Y en *Miranda* v. *Arizona,* supra, se expresó a las págs. 471–472:

Por consiguiente, sostenemos que es preciso que a la persona detenida para interrogatorio se le informe con claridad que tiene el derecho de consultar con un abogado y contar con su presencia durante el interrogatorio, bajo el sistema para proteger el privilegio que esbozamos hoy. Al igual que las advertencias respecto al derecho de permanecer callado y de que lo que diga puede usarse en su contra, esta advertencia es prerrequisito absoluto para el interrogatorio. Ninguna prueba circunstancial de que la persona pudo haber estado enterada de este derecho, bastará para sustituirlo.

Recientemente en *Tague* v. *Louisiana,* 444 U.S. 469, 470–471 (1980), se ratificó con votación de 8 a 1 a *Miranda* y al hacerlo se reafirmó lo expresado a la pág. 475:

Si el interrogatorio continúa sin la presencia de un abogado y se toma una declaración, sobre el gobierno recae la gran responsabilidad de demostrar que el acusado, consciente e inteligentemente, renunció a su derecho de no incriminarse y a su derecho de contratar o asignársele un abogado. *Escobedo* v. *Illinois,* 378 U.S. 478, 490, n. 14. Este Tribunal ha fijado siempre elevados estándares de prueba para el que renuncia a los derechos constitucionales, *Johnson* v. *Zerbst,* 304 U.S. 458 (1938), y reafirmamos estos estándares según se aplican al interrogatorio bajo custodia. Dado que el Estado es responsable de establecer las circunstancias aisladas bajo las cuales se lleva a cabo el interrogatorio y posee los únicos medios de hacer accesible la prueba corroborada sobre las advertencias hechas durante el interrogatorio en incomunicado, el peso recae directamente sobre sus hombros.

Luego de citar a *Miranda,* expresa:

Justo durante el último término, al sostener que una renuncia a los derechos *Miranda* no tenía que ser explícita, sino que podía inferirse de las acciones y las palabras de un interrogado, reiteramos firmemente que

"[L]os tribunales tienen que suponer que el acusado no renunció a sus derechos; el peso de la prueba que recae sobre el fiscal es grande . . ."

En este caso no se presentó ninguna evidencia para probar que el recurrente, consciente e inteligentemente, renunció a sus derechos antes de hacer la declaración incriminatoria. La declaración, por tanto, era inadmisible. Pág. 471.

El 18 de mayo del corriente la Corte Suprema federal ratificó a *Miranda* en *Edwards* v. *Arizona,* 451 U.S. 477, 482 (1981), al reafirmar que "[e]s razonablemente evidente, según nuestra jurisprudencia, que la renuncia a la asistencia legal no sólo tiene que ser voluntaria, sino que tiene que ser una renuncia o abandono consciente e inteligente de un derecho o privilegio reconocido, asunto que depende en cada caso 'de los hechos y circunstancias particulares que rodean ese caso, incluso el trasfondo, la experiencia y conducta del acusado'". (Citas omitidas.)

En el presente caso, aparte de que no se le advirtió al acusado de su derecho a estar asistido de abogado proporcionado por el Estado, tampoco surge que la renuncia fuera inteligentemente hecha con conocimiento de las consecuencias que tenía el confesar. Lo que sí surge de lo transcrito es que el agente le indujo a confesar diciéndole que "llega el momento en que uno se arrepiente y que cree que hablando con otra persona pueda desahogarse . . . , sentirse mejor". T.E., pág. 2.

La confesión obtenida sin cumplir con lo establecido por la jurisprudencia antes citada es inadmisible en evidencia.

## II

Aparte de lo anterior, aun si se hubieran hecho las advertencias, y la confesión fuese admisible, la convicción

del acusado tiene que descansar en algo más firme que una mera admisión o confesión no corroborada. Es un principio bien establecido que las admisiones de un acusado sobre hechos que lo incriminen, si no son corroborados por otra evidencia, no son suficientes para sostener una convicción. *Pueblo* v. *Pérez Fernández*, 95 D.P.R. 919, 923 (1968); *Pueblo* v. *Campos Suárez*, 86 D.P.R. 310, 313 (1962) opinión concurrente; *Wong Sun* v. *United States*, 371 U.S. 471 (1963); *Opper* v. *United States*, 348 U.S. 84 (1954); L. B. Orfield, *Confessions of Federal Criminal Defendants*, 16 U. Fla. L. Rev. 219, 241 (1963); Comment, *Corroboration of Extrajudicial Statements*, 7 Stan. L. Rev. 378 (1955); 7 Wigmore, *Evidence* § 2071 *et seq.* (Chadbourn rev. 1978).

En *Pérez Fernández*, supra, págs. 921–922, expresamos:

En los tribunales federales la regla establecida es que la convicción de un acusado tiene que descansar en algo más firme que una mera admisión o confesión no corroborada. *Wong Sun* v. *United States*, 371 U.S. 471, 9 L.Ed.2d 441, 456 (1963). Desde el caso de *Opper* v. *United States*, 348 U.S. 84, 99 L.Ed. 101 (1953) se extendieron a las admisiones las mismas garantías que a las confesiones a base de que aquéllas participan de las mismas características que éstas. Ahora bien, la evidencia corroborativa no tiene que ser de tal grado que, independientemente de las admisiones, establezca el *corpus delicti*. Lo que se requiere es que El Pueblo traiga evidencia sustancial independiente que tienda a establecer la veracidad de las admisiones. Es suficiente que la prueba de corroboración sostenga los hechos esenciales admitidos y que justifique hacer una inferencia sobre su veracidad. *Opper* v. *United States*, supra.

En la mayoría de las jurisdicciones estatales se ha seguido esta regla y es un principio bien establecido que las admisiones de un acusado sobre hechos que lo incriminen si no son corroboradas por otra evidencia, no son suficientes para sostener una convicción. Pero los tribunales están de acuerdo en que no es necesario que la evidencia corroborativa por sí sola e independientemente de la admisión establezca el *corpus delicti*; ni la culpabilidad del acusado fuera de duda

razonable; ni tiene que tener un carácter concluyente. Evidencia circunstancial puede ser suficiente corroboración y cuando hay alguna evidencia *aliunde* tendiente a establecer el *corpus delicti*, la admisión puede ser considerada en relación con esa evidencia para establecer el *corpus delicti —Corroboration of Extrajudicial Confession or Admission*, 45 A.L.R.2d 1316 y casos allí citados.

La razón de la norma la expresa el Tribunal de los Estados Unidos en *Smith* v. *United States*, 348 U.S. 147 (1954), al expresar:

La norma general de que no es posible condenar a un acusado a base de su propia confesión no corroborada, ha sido reconocida antes por este Tribunal, *Warszower* v. *United States*, 312 U.S. 342; *Isaacs* v. *United States*, 159 U.S. 487; *cf. Miles* v. *United States*, 103 U.S. 304, 311–312 y se ha aplicado consistentemente en los tribunales federales inferiores y en la inmensa mayoría de los tribunales estatales, 127 A.L.R. 1130; 7 Wigmore, Evidence, §§ 2070–2072. Su propósito es evitar "errores en condenas basadas únicamente en confesiones falsas", *Warszower* v. *United States*, supra, pág. 347; sus cimientos descansan sobre una larga historia de experiencia judicial en confesiones y sobre el hecho de que comprendemos que hacer cumplir la ley con firmeza requiere de investigaciones policíacas que se extiendan más allá de las palabras del acusado. Puede que las confesiones no sean confiables, porque sean forzadas o inducidas y, aunque doctrinas separadas excluyen de la consideración del jurado confesiones involuntarias, *Bram* v. *United States*, [168 U.S. 532 (1897)]; *Wilson* v. *United States*, [162 U.S. 613 (1896)], se justifica mayor cautela, debido a que es posible que el acusado no pueda demostrar la naturaleza involuntaria de sus declaraciones. Por otra parte, aunque una declaración no sea "involuntaria" dentro del significado de esta norma exclusionaria, su confiabilidad podría resultar dudosa si se obtiene de alguien que está bajo la presión de una investigación policíaca, cuyas palabras pueden ser un reflejo de la tensión y la confusión presentes en la difícil situación por la que atraviesa y no un claro reflejo de su pasado. Por último, la experiencia de los tribunales, la policía y la profesión médica refiere un sinnúmero de confesiones falsas hechas

voluntariamente, Note, 28 Ind. L. J. 374. Estas consideraciones justifican que se restrinja el poder del jurado para condenar, porque el jurado promedio no comparte esta experiencia en confesiones. Págs. 152–153.

En sus inicios la norma era un tanto restringida. Una vez establecido el *corpus delicti*, la confesión del acusado era suficiente para establecer su culpabilidad más allá de duda razonable. "En sus inicios, la norma de corroboración desempeñó una función extremadamente limitada. A fin de condenar por crímenes graves de violencia, entonces delitos capitales, se requería prueba independiente de que alguien en efecto había infligido la violencia, el llamado *corpus delicti*. Sin embargo cuando se determinaba la existencia del crimen la culpabilidad del acusado se podía basar en su propia confesión no corroborada." *Smith*, supra, págs. 153–154.

Pero la aplicación así restringida de la norma va contra el propósito mismo que la inspiró. De hecho, ha sido criticada. Ver *United States* v. *Opdahl*, 610 F.2d 490, 494 (8th Cir. 1979), opinión concurrente; *Developments in the Law—Confessions*, 79 Harv. L. Rev. 935, 1082–1083 (1966); Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession*, 103 U. Pa. L. Rev. 638, 676–77 (1955). No se puede confiar en las meras palabras de una persona que admite unos hechos, si no existen indicios por más tenues que sean, que la conecten con el hecho delictivo, pues la admisión puede deberse a factores emocionales o bien a coacciones físicas o sicológicas. La evidencia corroborativa no tiene que ser de tal grado que, independientemente de las admisiones establezca el *corpus delicti*. Es suficiente que la prueba de corroboración sostenga los hechos esenciales admitidos y que justifique hacer una inferencia sobre su veracidad. La corroboración puede establecerse mediante prueba directa o circunstancial. Como se consignó en *Pueblo* v. *Campos Suárez*, supra, a la pág. 317:

Ahora, ¿qué evidencia se requiere para corroborar un

hecho admitido por un acusado? El caso de *Opper* establece como requisito el que la prueba de corroboración tienda a establecer la confiabilidad o veracidad del hecho admitido. O sea, que el juzgador tenga ante sí prueba que le induzca a creer que es verdad la admisión; que no dependa exclusivamente del testimonio del acusado; que haya otra prueba que le justifique determinar que lo que el acusado admitió es cierto. Esa es suficiente garantía. *Martínez* v. *United States*, 295 F.2d 426 (10th Cir. 1961); *Ramírez* v. *United States*, 294 F.2d 277 (9th Cir. 1961); *Bryson* v. *United States*, 238 F.2d 657 (9th Cir. 1956); *Gulotta* v. *United States*, 113 F.2d 683 (8th Cir. 1940); *State* v. *Saltzman*, 44 N.W.2d 24 (Iowa 1950); Wigmore, *op. cit.*, § 2071; Comentarios: *Corroboration of Extrajudicial Statements*, 7 Stan. L. Rev. 378 (1955); *Corroboration of Admissions*, 22 U. Chi. L. Rev. 902 (1954); 41 A.B.A.J. 161 (1955); *cf. Pueblo* v. *Colón*, 81 D.P.R. 814 (1960).

Es pertinente citar lo expresado por la Corte de Apelaciones para el Circuito del Distrito de Columbia en *Naples* v. *United States*, 344 F.2d 508, 513–514 (1964):

Para evitar los riesgos de una condena basada en confesiones falsas inducidas por alguna compulsión interna, es posible que baste una corroboración mínima de las confesiones. Pero no siempre bastará para preservar la integridad de nuestro sistema de justicia criminal . . . Por lo tanto, se debe exigir suficiente prueba extrínseca para resguardar la integridad del derecho contra la auto-incriminación, la presunción de que todo acusado es inocente hasta tanto se demuestre su culpabilidad más allá de duda razonable y la naturaleza acusatoria de nuestro sistema.

Ver además: *Matter of R.A.B.*, 399 A.2d 81 (1979); Note, *Voluntary False Confessions: A Neglected Area in Criminal Administration*, 28 Ind. L.J. 374 (1953), donde se hace un excelente estudio sobre las confesiones espurias.

En el caso de autos no se presentó un ápice de prueba que tienda a establecer la veracidad de la confesión. Un examen de la prueba presentada revela que no hay indicio alguno que corrobore la confesión prestada por el acusado.

La prueba, según surge de la exposición narrativa de la prueba es flaca y descarnada. Si el agente que investigó el caso hubiese prestado testimonio en que describiera el sitio de la casa donde apareció la víctima, la posición en que se encontraba, así como otros detalles, y el apelante en su confesión los hubiera descrito en la misma o parecida forma, ello hubiese sido suficiente para corroborar la confesión. Pero nada de esto surge de la prueba. Por el contrario, resulta extraño que luego de que supuestamente el apelante confesara,(1) el agente no prestara declaración jurada de los hechos del caso ante ningún fiscal y que no se llevara al acusado para que ante un fiscal prestase una declaración jurada sobre la alegada confesión. *Vide*, E.N.P., págs. 3–4. Más aún, el agente declaró que el acusado lo acompañó al sitio donde dijo que había guardado el dinero y que luego de buscarlo no lo encontraron., *Vide*, E.N.P., pág. 2. Nótese, además, que dos testigos que no tienen vínculos familiares con el apelante declararon que al momento de los hechos vieron al apelante trabajando en el negocio de su abuelo. *Vide*, E.N.P., pág. 8. Adviértase que se tomaron huellas digitales de todo el cuarto y se ocupó un machete y un cuchillo. *Vide*, E.N.P., pág. 5. Sin embargo, no se presentó en evidencia ninguna huella. El Hon. J. Ayala Cádiz declaró que en la vista preliminar en alzada el agente León había dicho que cuando entrevistó a los vecinos donde ocurrieron los hechos una señora le había informado que al que vio salir corriendo de la casa del muerto fue a una persona trigueña con afro y con una pantalla en la oreja. A la luz de estos hechos incontrovertidos de la prueba presentada no hay prueba corroborativa de la confesión y existe duda razonable sobre la responsabilidad del acusado. Aparte de que, como hemos visto antes, la confesión es inadmisible.

Revocaría la sentencia.

---

(1) Hay indicios en la prueba de que el apelante fue objeto de coacción física. Ante las actuaciones del agente, el abuelo del apelante sufrió un colapso.