EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* AGUSTÍN ALCALÁ FERNÁNDEZ, acusado y apelante.

*Número:* CR-78-63      *Resuelto:* 13 de febrero de 1980

*Heyda Vigil McClin*, de la Sociedad para la Asistencia Legal, abogada del apelante; *Héctor A. Colón Cruz, Procurador General*, y *Rose Mary Corchado Lorent, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

El apelante Agustín Alcalá Fernández fue declarado culpable del delito de asesinato en primer grado al perpetrar los delitos de violación y sodomía en la niña Jancy Préstamo de cuatro años de edad ocasionándole la muerte. Los hechos ocurrieron en el Residencial Dr. Pila de la ciudad de Ponce pero a solicitud del apelante el Hon. Arturo Cintrón García en una resolución ampliamente fundada ordenó el traslado del caso a la Sala de San Juan, lugar en que se celebró el juicio por tribunal de derecho al renunciar el apelante a un juicio por jurado.

En apelación Alcalá Fernández impugna el fallo condenatorio señalando como error que su confesión y admisiones incriminatorias fueron el producto de un arresto ilegal y de la coacción en violación de sus derechos constitucionales. Es menester resumir los hechos pertinentes para considerar en su debida perspectiva el planteamiento del apelante y nuestra conclusión.

En la noche del 31 de diciembre de 1977 se reunieron varios vecinos con el propósito de despedir el año en la acera del bloque 31 del Residencial Dr. Pila de Ponce. Allí se encontraba la infortunada Jancy, su señora madre Graciela Rodríguez y el apelante Agustín Alcalá Fernández. Minutos después de las doce de la noche Graciela subió por unos minutos a su apartamento y al bajar notó la ausencia de Jancy. Preguntó por ella y un vecino le informó que la había visto parada en la acera frente al bloque 32 al lado del apelante. Al no ver a éste ni a la nena empezó a gritar y todos salieron a buscarla por los alrededores. Fueron al apartamento donde vivía el apelante con su hermano pero no lo encontraron. A las dos de la mañana cuando llegó la policía al apartamento a investigar la desaparición de Jancy ya el apelante había regresado. El policía le pidió que se vistiera y le acompañara al cuartel para una investigación. El apelante se vistió rápidamente y se fue con el policía al cuartel. Allí le informaron que se había reportado como desaparecida a la niña Jancy Préstamo y que como él era la última persona que

se había visto cerca de ella lo habían llevado al cuartel para conversar con él y ver si podía brindarles cualquier información que les ayudara a localizarla.

No le hicieron advertencia alguna en ese momento porque él no estaba detenido ni lo consideraban sospechoso de delito ya que no se había reportado delito alguno. De todas maneras el apelante no ofreció información y poco tiempo después le informaron que podía irse. El apelante no quiso regresar al Residencial Dr. Pila y pidió a la policía que lo llevara al Residencial Villa Pámpanos donde su hermano le había gestionado alojamiento.

El seis de enero la niña apareció muerta en unos matorrales cerca del Residencial Dr. Pila. Notificado del hallazgo, el Sargento Flor Casiano fue al lugar de los hechos en un auto patrulla. Es allí donde sospecha del apelante y decide ir a buscarlo a Villa Pámpanos para llevarlo a la oficina.

Considerado ya el apelante sospechoso de delito, Casiano le hizo entonces las advertencias de rigor informándole que la niña había aparecido muerta y que él era un sospechoso del crimen; que tenía derecho a estar asistido de abogado, que si no lo podía pagar él haría las gestiones para conseguirle uno; que tenía derecho a permanecer callado; que cualquier cosa que dijera podía ser utilizada en su contra y que podía estar asistido de un familiar cercano, habiendo accedido ya, dicho sea de paso, a que su hermano lo acompañara. Casiano llamó por teléfono a la Oficina de Investigaciones Criminales y para mayor seguridad pidió que le trajeran un automóvil sin rotular. Se movieron todos en el vehículo rotulado a un lugar cercano frente al *drive-in* a esperar el vehículo sin rotular. Casiano se bajó del automóvil, siguiéndolo el apelante y otro agente. José, el hermano del apelante, se quedó dentro del automóvil. Caminaron los tres alrededor de quince pasos cuando el apelante preguntó a Casiano si era cierto que la niña había aparecido muerta, contestándole Casiano afirmativamente. Casiano volvió a hacerle las advertencias leyéndoselas de una tarjeta que se usa para esos fines. Fue entonces

que el apelante expresó: "Ah, si yo no la quería matar." T.E., Vol. I, pág. 162. Casiano volvió a hacerle las advertencias pero el apelante continuó: "Oh, si yo no sé como se me vino a mí a la mente. Si yo a quien estaba velando... era a Milagros... pero como esas eran cosas de *picao* que se llevó esa nena...." Acto seguido indicó el apelante que había intentado violar a la niña pero que al verla "aleteando mucho" la había dejado tirada en el matorral. *Id.* a las págs. 164, 165. En eso llegó el fiscal Justo Torres en un vehículo, se le informó que el apelante había confesado y se fueron a la Oficina del Negociado de Asuntos Criminales donde el fiscal entrevistó al apelante.

Salieron de la Oficina del Negociado de Asuntos Criminales al lugar de los hechos y el apelante les explicó con lujo de detalles la ruta que había seguido con la niña desde el frente de los apartamentos hasta el pastizal donde apareció muerta. El público se aglomeró, se exaltaron los ánimos y tuvieron que correr hacia el automóvil para protegerse de la ira de los vecinos. Salieron para la Fiscalía donde el fiscal le hace las advertencias de rigor, le consigue a un abogado para que lo asista en los procedimientos y el apelante vuelve a hacer admisiones de culpabilidad y a prestar una declaración por escrito.

Hasta aquí los hechos pertinentes para considerar los planteamientos del apelante. No es necesario resumir los múltiples incidentes que ocurrieron en la Fiscalía porque aun eliminando la confesión escrita que allí hizo el apelante, hay en el récord prueba suficiente que sostiene ampliamente el fallo condenatorio.

El apelante sostiene que las admisiones inculpatorias al Sargento Flor Casiano y al fiscal no son admisibles como prueba en su contra por ser las mismas el producto de un arresto ilegal y de presiones indebidas, y que su renuncia al derecho a no autoincriminarse no fue voluntaria ni inteligentemente hecha. A esos efectos, arguye que fue ilegalmente detenido la noche del primero de enero y que se le sometió a un proceso inquisitorial para presionarle a que hablara; que el

día dos de enero estuvo sujeto a otra intervención por el Alcalde de Ponce que llevaba el propósito de inducirlo a declarar con promesas de ayudarlo; que la detención del seis de enero fue ilegal porque la mera sospecha del Sargento Flor Casiano no constituía motivo fundado para justificar el arresto; que tampoco fue suficiente para conectarlo con el crimen el hecho de que se viera a la niña por última vez parada junto a él; que siendo ilegal la detención efectuada el 6 de enero, aunque el Sargento Casiano le hizo las advertencias de ley, sus admisiones inculpatorias en esa ocasión eran inadmisibles por ser el fruto de un arresto ilegal conforme lo resuelto en *Wong Sun* v. *United States*, 371 U.S. 471 (1963) y *Brown* v. *Illinois*, 422 U.S. 590 (1975).

Es decir, el apelante engarza en su argumentación incidentes acaecidos en tres momentos distintos, el día primero de enero, el dos y el seis para sostener la inadmisibilidad de sus declaraciones incriminatorias. En aras de la mayor claridad en la discusión consideraremos estos incidentes separadamente para determinar: (a) la legalidad del arresto y (b) la voluntariedad de la confesión. En cuanto a lo segundo, por supuesto, se trata de determinar si medió por parte del apelante una renuncia consciente e inteligente del privilegio contra la autoincriminación.

*Legalidad del arresto*

Como se sabe, un funcionario de orden público puede efectuar un arresto sin la orden correspondiente, entre otros casos, cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave, independientemente de que dicho delito se hubiese cometido o no en realidad. Regla 11 de Procedimiento Criminal, 2 *Práctica Forense*, pág. 20. La jurisprudencia enmarca el concepto de "motivo fundado" en la posesión de aquella información y conocimiento que lleven a una persona ordinaria y prudente a creer que el arrestado ha cometido delito. *Pueblo* v. *Cabrera Cepeda*, 92 D.P.R. 70, 74 (1965); *Cepero Rivera* v. *Tribunal Superior*, 93 D.P.R. 245, 248 (1966). La

conducta del funcionario público se juzga pues en orden al criterio de la persona prudente y razonable, por lo que es necesario considerar las circunstancias específicas del arresto para determinar su validez.

■ Debe advertirse que el primero de enero no hubo arresto ni el apelante hizo admisión alguna que lesionara sus derechos constitucionales. Se recordará que esa noche él fue conducido voluntariamente al Cuartel de la Policía con el propósito de conversar con él para ver si podía suministrar alguna información relacionada con el paradero de la niña ya que él fue la persona que se vio cerca de ella por última vez. Aún no se le consideraba sospechoso de delito porque todavía no había información de que se hubiera cometido delito alguno y, por tanto, no era necesario que la policía le hiciera las advertencias de rigor. Así lo acepta el apelante en su alegato.

No obstante, el apelante arranca de los incidentes de esa noche para atacar las admisiones inculpatorias que posteriormente hizo fundándose en que el hecho de haber estado detenido en el Cuartel desde las dos de la mañana hasta cerca de las cuatro de la tarde constituía una presión psicológica indebida que le indujo a incriminarse. No tiene razón. Como hemos visto, la prueba demostró que su estadía en el Cuartel se prolongó debido a que su hermano salió a hacer gestiones para conseguirle alojamiento en Villa Pámpanos, ya que debido a la exaltación de los ánimos en el vecindario del Residencial Dr. Pila ellos consideraron prudente no regresar a ese lugar.

Consideraremos ahora las circunstancias que motivaron el arresto del apelante el seis de enero.

El punto de partida para el arresto fue la aparición del cadáver de la niña ese día. El Sargento Casiano tuvo ante sí en ese momento como hechos irrefutables (1) la desaparición de la niña en circunstancias singulares el primero de enero; (2) la reacción espontánea de los vecinos que inmediatamente señalaron al apelante como sospechoso hasta el punto que al

primer sitio que se dirigieron a buscarla es a su apartamento; (3) el hecho de que fue él la última persona que se vio junto a la niña asesinada; (4) la decisión voluntaria del apelante y su hermano de no regresar al apartamento del Dr. Pila por temor a la ira de los vecinos y (5) la aparición del cadáver de la niña.

No se trataba, como arguye el apelante, de una mera sospecha por el hecho de haber sido él la persona junto a la cual se vio a la niña por última vez, sino de un conjunto de circunstancias cuyo conocimiento constituía motivo fundado para que una persona razonable y prudente creyera que él había asesinado a la niña desaparecida. En consecuencia, la actuación del Sargento Casiano de arrestar al apelante el seis de enero estuvo ampliamente justificada, conforme los criterios establecidos en la Regla 11 de Procedimiento Criminal, *supra,* y la jurisprudencia interpretativa de la misma. No son de aplicación al caso de autos lo resuelto en los casos de *Wong Sun* v. *United States*, supra, ni *Brown* v. *Illinois*, supra, citados por el apelante en su alegato, por tratarse de un arresto legal.

## Voluntariedad de la confesión

La prueba demuestra que el Sargento Casiano hizo al apelante las advertencias de rigor en dos ocasiones: al momento de efectuar el arresto en Villa Pámpanos y al comenzar el apelante a hacerle las admisiones incriminatorias frente al moto-cine cuando se detuvieron a ocupar el vehículo sin rotular. El apelante no cuestiona la validez de las advertencias que le hizo el Sargento Casiano, las cuales hemos examinado en el récord y encontramos que cumplen rigurosamente con las normas requeridas en *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 657 (1965) y *Pueblo* v. *Guadalupe Rosa*, 94 D.P.R. 190 (1967). Sostiene, sin embargo, que las mismas no son admisibles porque son el producto de la coacción y el engaño, y, que su renuncia al privilegio de la autoincriminación no fue consciente ni inteligentemente hecha. No tiene razón.

El récord demuestra que no hubo coacción física ni sicológica para inducir al apelante a incriminarse. Su propio hermano José declaró como testigo de la Defensa que no hubo en su presencia amenazas ni coacción física:

"P. Le pregunto, desde ese instante en que Agustín y Casiano se montan en el carro, se detienen más alante, usted estaba presente cuando se detiene, está presente en el carro, le pregunto si algún agente, Casiano o alguna otra persona amenazó de palabras a este señor Agustín, le dijo: "Mira . . . , alguna amenaza de esas de palabras."

"R. *No, no, en honor a la verdad, en mi presencia yo no* vi." T.E., Vol. III, pág. 27 (Énfasis suplido.)

Más adelante José ratifica que en el trayecto del moto-cine a la Comandancia, los agentes se portaron calmadamente y que no hubo agresión o amenaza alguna. T.E., Vol. III, págs. 32, 33. Aparece, además, del récord que en ese momento no había la presencia de un público hostil ni aglomeración excesiva de agentes del orden que pudieran amedrentar sicológicamente al apelante. Su hermano estuvo presente desde el momento del arresto en Villa Pámpanos hasta llegar a la Comandancia. Al momento de hacer las admisiones incriminatorias sólo estaban presentes el Sargento Casiano, dos agentes de la policía y, como a veinte pasos de ellos, su propio hermano sentado en el automóvil. Tampoco fue el apelante sometido a un interrogatorio persistente, ni agresivo, ni incomunicado en forma alguna.

Todas estas circunstancias son muy diferentes a las presentes en *Pueblo* v. *Fournier*, 77 D.P.R. 222 (1954), que tan insistentemente cita en su apoyo el apelante. Por otro lado, el apelante es una persona normal que cursó hasta el octavo grado, tomó un curso comercial, trabajó en la oficina de un abogado por varios años y a la fecha de la comisión del delito era empleado del Municipio; todo lo cual demuestra su capacidad para entender las advertencias que se le hicieron y la consecuencia de su admisión con respecto a su culpabilidad.

■ Los hechos anteriormente apuntados nos convencen

que las admisiones incriminatorias hechas por el apelante el día 6 de enero al Sargento Casiano fueron voluntarias, inteligentes y conscientemente hechas por lo que fue correcta la actuación del tribunal de instancia al admitirlas en evidencia.

No hemos considerado necesario referirnos al argumento del apelante de que el Alcalde de Ponce le hizo promesas para inducirlo a declarar cuando él y su hermano se reunieron el dos de enero con el Alcalde en los terrenos donde ubican las oficinas del Municipio de la Playa de Ponce. El récord guarda silencio sobre el contenido de esas conversaciones y el alcance y naturaleza de las mismas, por lo que no estamos en condiciones de juzgar el efecto que pudieron tener, si alguno, en la mente del apelante para determinar si éstas constituyeron o no presión indebida.

*Se dictará sentencia confirmando la aquí apelada.*