EL PUEBLO DE PUERTO RICO, apelado, *v.* ROBERTO CASTRO SANTIAGO y MARCIAL SANTIAGO CENTENO, acusados y apelantes.

Número: CR-87-68    Resuelto: 21 de junio de 1989

*Carmen Ana Rodríguez, Felipe Cirino Colón* y *Enrique Rivera Mendoza,* de la *División de Apelaciones de la Sociedad para Asistencia Legal,* abogados de los apelantes; *Norma Cotti Cruz, Subprocuradora General,* y *Carmen A. Bravo de Riefkohl, Procuradora General Auxiliar,* abogadas de El Pueblo.

## SENTENCIA

Los acusados Roberto Castro Santiago y Marcial Santiago Centeno fueron hallados culpables de apropiación ilegal agravada en el Tribunal Superior de Puerto Rico, Sala de Guayama.

Cuestionan los apelantes su convicción al alegar que ésta fue mediante prueba insuficiente en derecho y mediante la presentación de evidencia inadmisible por ser producto de un arresto y registro ilegales. Examinados cuidadosamente

los autos originales y la exposición narrativa de la prueba, procede la revocación de la sentencia.

## I

De la exposición narrativa de la prueba y del testimonio de uno de los policías que intervino con los apelantes se desprende que el 23 de diciembre de 1986 Castro Santiago y Santiago Centeno se encontraban, a eso de las 3:30 de la madrugada, caminando por la carretera de Machete en Guayama. Dicha ruta es la salida del pueblo hacia el expreso de San Juan a Ponce. A esa hora el policía Torres Texidor y su compañero patrullaban, en un vehículo oficial debidamente rotulado, por el centro del pueblo. Al divisar a los acusados apelantes, el policía Torres Texidor le dijo a su compañero: "tenemos clientes", porque nunca antes los había visto. E.N.P., pág. 2.

Se dedicaron a vigilarlos y, luego de varias rondas, el policía Torres Texidor se percató que Castro Santiago y Santiago Centeno habían entrado en la Panadería Díaz localizada en la Calle McArthur, una de las principales y más transitadas del pueblo,[1] que termina en la Calle Derkes. Allí compraron varios comestibles, hablaron con los policías, pagaron y abandonaron el lugar.

La patrulla continuó su ronda y en la Farmacia Myrna, localizada cerca de la plaza, vieron a los acusados apelantes comiendo lo que habían comprado anteriormente. Luego de varias vueltas, al bajar por la Calle Derkes, a poca distancia de la plaza del pueblo, el policía Torres Texidor vio a Santiago Centeno solo.

El policía se sorprendió y decidió inquirirle a Santiago Centeno por su compañero. Éste le dijo que Castro Santiago

---

[1] Tomamos conocimiento judicial del mapa del pueblo de Guayama que señala la forma en que discurre el tránsito en la ciudad y sus calles, y lugares más importantes. Regla 11(A)(2) de Evidencia, 32 L.P.R.A. Ap. IV.

había regresado a la panadería. El policía Torres Texidor fue en el automóvil hasta la panadería y no encontró a Castro Santiago. Entonces decidió continuar con su patrullaje y, al pasar por la Farmacia Myrna, se percató que Santiago Centeno se alejaba del lugar de forma precipitada sin nada en las manos. Es entonces cuando el policía miró por el espejo retrovisor de su patrulla y vio a Castro Santiago "saliendo" del Centro de Cuidado Diurno, entidad propiedad del Estado Libre Asociado, que está localizado a poca distancia de la plaza. El policía Torres Texidor no intervino con Castro Santiago en esos momentos. Continuó su patrullaje para darle una oportunidad (*break*), E.N.P., pág. 3, y al dar otra vuelta por el pueblo decidió intervenir con el acusado apelante que se encontraba caminando solo por otra calle. Lo arrestó frente a la tienda "Visto", le hizo las advertencias y lo registró.

El único fruto de ese registro fue un módico frasco de perfume marca "Avon" que tenía en un bolsillo. Durante el juicio, el frasco de perfume fue admitido como evidencia. A preguntas del policía Torres Texidor, el apelante afirmó que el perfume se lo habían regalado. El policía Torres Texidor, con diecisiete (17) años de experiencia en la uniformada, no realizó ninguna investigación adicional de los alrededores ni en el Centro de Cuidado Diurno. Sin ulterior información, procedió a llevarlo al Cuartel de la Policía y no ante un juez en el Centro Judicial de Guayama.

Mientras permanecía allí, llegó un individuo identificado solamente como Ortiz, que dijo que el acompañante de Castro Santiago era "un pillo del diablo" a quien le decían "Mulato" (E.N.P., pág. 3), y que éste se dirigía hacia Salinas. Con ese solo dato, y sin conocer a Ortiz, el policía Torres Texidor llamó a Salinas y ordenó su detención.

Aproximadamente tres (3) horas después del arresto, se recibió en el Cuartel de la Policía de Guayama una querella del Centro de Cuidado Diurno informando un escalamiento. Entre los artículos hurtados figuraban una grabadora, una

secadora, un proyector, un pote grande de jugo de china y varios regalos que se iban a distribuir en la fiesta de Navidad de 24 de diciembre. Entre éstos había dos (2) relojes despertadores, un reloj digital, cuatro (4) perfumes y una (1) camisa de hombre. E.N.P., pág. 6. El policía Torres Texidor acudió a investigar la querella. Allí, la Sra. Luz D. Santiago informó sobre la mercancía hurtada y confirmó el hecho de que el perfume ocupado a Castro Santiago era similar a uno de los perfumes hurtados. Sin embargo, éste no estaba en las mismas condiciones que lo había dejado, ya que el referido perfume estaba en su caja, listo para ser regalado.

Celebrado el juicio, Santiago Centeno y Castro Santiago fueron hallados culpables de apropiación ilegal agravada. Se les sentenció a seis (6) años de reclusión. Los acusados apelantes nos señalan la comisión de dos (2) errores, a saber, insuficiencia de prueba para sostener la convicción y admisión de evidencia inadmisible por ser fruto de un registro ilegal. Resolvemos.

## II

Reiteradamente hemos establecido que este Tribunal no intervendrá con la apreciación de la prueba y la credibilidad de los testigos a menos que exista error, prejuicio o parcialidad. *Pueblo v. Bianchi Álvarez*, 117 D.P.R. 484 (1986). Sin embargo, el significado de la anterior proposición no es el que no podamos revisar la determinación de que se ha probado la culpabilidad más allá de duda razonable como cuestión de derecho, especialmente cuando del análisis de la prueba surge una duda seria y ponderada. *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981). Es esta la duda razonable que nos lleva a revocar una convicción. *Pueblo v. Gagot Mangual*, 96 D.P.R. 625 (1968). "De ahí en que en muchos casos no hemos vacilado en dejar sin efecto un fallo condenatorio cuando un análisis de la prueba que tuvo ante sí el tribunal sentenciador nos deja serias dudas, razonables y fundadas,

sobre la culpabilidad del acusado." *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 551 (1974). Probar la comisión de un delito más allá de duda razonable significa presentar prueba que, además de ser suficiente, deberá ser satisfactoria. Debe producir "certeza o convicción moral en una conciencia exenta de preocupación". *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 552. Examinemos las manifestaciones anteriores a la luz de los hechos del presente caso.

Castro Santiago y Santiago Centeno estaban caminando por las principales calles de Guayama, cuando el policía Torres Texidor decidió vigilarlos sin ningún motivo fundado para hacerlo. En ningún momento habían exhibido una conducta sospechosa ni cometido un delito en presencia de los policías. Tampoco el policía Torres Texidor había recibido información de alguna actividad delictiva ocurrida esa noche en ese sector de Guayama. En nuestro país no constituye conducta sospechosa el comprar comestibles en una panadería durante la madrugada ni comerlos en la calle principal de cualquiera de los pueblos del país.

Recordemos que se trataba de un 23 de diciembre en plena época navideña donde la orden del día son las parrandas y fiestas. Además, el pueblo de Guayama es la cabecera de ese distrito y, para 1980, tenía 40,183 habitantes. *Censo de población de 1980: características generales, sociales y económicas*, Departamento de Comercio de los Estados Unidos, Negociado del Censo, 1984, Vol. 1, Cap. C. Evidentemente no estamos hablando del pequeño pueblo de la isla durante el siglo pasado, donde todos sus habitantes se conocían entre sí. De igual manera es inconcebible e irrazonable pensar que por el mero hecho de que el policía Torres Texidor no conociera a los apelantes, y porque nunca los hubiera visto, decidiera seguirlos. Si es cierto, como alega el policía, que a esa hora de la madrugada solamente están los basureros recogiendo la basura, ¿por qué había una panade-

ría abierta?; ¿acaso no existe en este proceso esa duda razonable que nos impide tener la conciencia tranquila?

Por otro lado, el apelante Santiago Centeno no estaba en el lugar de los hechos cuando fue arrestado Castro Santiago. Tampoco se le vio salir del Centro de Cuidado Diurno. Su "actividad sospechosa" se limitó a acompañar durante un período de tiempo a Castro Santiago y comer con él en una vía pública. Su arresto se realizó días después con la única información obtenida de una persona, quien nunca fue identificada. No se celebró una rueda de detenidos ni se procedió con ningún otro tipo de identificación. ¿Es acaso esta prueba suficiente para sostener una convicción? Entendemos que no.

La Regla 11(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, establece las circunstancias en las cuales un funcionario del orden público podrá hacer un arresto. Será cuando tenga motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave, independientemente de que dicho delito se hubiese cometido en realidad. El concepto "motivos fundados" significa aquella posesión de información y conocimiento que lleven a una persona ordinaria y prudente a pensar que el arrestado ha cometido un delito. *Pueblo v. Alcalá Fernández*, 109 D.P.R. 326, 331 (1980). Es sinónimo de "causa probable", según se utiliza el concepto para la expedición de una orden de arresto. Los motivos fundados pueden ser colectivos, es decir, a base de información provista por otros agentes. *Pueblo v. Martínez Torres*, 120 D.P.R. 496 (1988). Sin embargo, no basta un mero prejuicio. Es necesario un mínimo de información que indique la posible comisión de un delito.

La referida regla, al exigir la presencia de motivos fundados para validar un arresto a una persona que parece haber cometido un delito, no autoriza todo arresto hecho por un funcionario del orden público en circunstancias poco comunes. "Motivos fundados" no es sinónimo de libertad para

intervenir irrestrictivamente o irrazonablemente. El conjunto de circunstancias presentes en cada caso debe evaluarse de manera particular para determinar si una persona razonable y prudente hubiera creído que se había cometido el delito. *Pueblo v. Alcalá Fernández*, supra, pág. 330; *Pueblo v. Cabrera Cepeda*, 92 D.P.R. 70, 74 (1965). No puede tratarse de una mera sospecha o de un mero capricho. Al amparo de los "motivos fundados" no podemos convalidar todo arresto hecho por la Policía cuando se "vea" salir a una persona de un edificio público en horas de la madrugada. ¿Qué pasaría si se trata de un desprotegido y marginado social que duerme en las calles y en las entradas de los edificios públicos?; ¿y si se trata de un funcionario público que trabajó hasta altas horas de la madrugada?

La justicia que protegemos como parte de nuestra función no nos permite, como sugiere la opinión disidente, que hoy modifiquemos la doctrina sobre motivos fundados que anteriormente hemos elaborado. Reconocemos que "[p]retender que el policía sólo pueda arrestar cuando se ha cometido un delito en vez de cuando tuviera motivos fundados para creer que se ha cometido, prácticamente quiere decir que los policías tendrían que ser magistrados y tendrían que celebrar un juicio para ver si se ha cometido el delito o no y, en caso afirmativo, entonces proceder al arresto". (Énfasis omitido.) *Cepero Rivera v. Tribunal Superior*, 93 D.P.R. 245, 248 (1966).

Sin embargo, nuestro sistema democrático y nuestro ordenamiento constitucional no nos autorizan, con el fin de resolver el problema de la criminalidad, a suprimir la protección que brindan los derechos constitucionales. Recordemos que la Constitución aplica a todos por igual. *No podemos permitir que la Policía arreste a cualquier ciudadano en cualquier momento y en cualquier lugar a base de la más mínima sospecha.* "El sistema democrático de vida se funda en la libertad con orden, no en el orden sin libertad o en la liber-

tad que lleve al caos." *Pueblo v. Dolce*, 105 D.P.R. 422, 435 (1976).

Definitivamente, en el caso ante nos no existía ese mínimo exigible para activar la aplicación de la Regla 11(c) de Procedimiento Criminal, *supra*. El arresto fue ilegal.

Por último, si hay un arresto ilegal, el registro per se es ilegal y la evidencia ocupada es inadmisible. El hecho de que se ocupe evidencia delictiva no convalida un arresto ilegal. *Pueblo v. Martínez Torres*, supra, que cita con aprobación a *Pueblo v. González Rivera*, 100 D.P.R. 651 (1972). En *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986), expresamos que una vez el acusado establece que la evidencia fue ocupada sin la debida orden de arresto o registro es función del Ministerio Fiscal demostrar que el registro fue razonable. En el caso ante nos, el Ministerio Fiscal no demostró durante el juicio la validez del arresto ni la razonabilidad del registro. Por lo tanto, no nos puso en posición de considerar la suficiencia de éstos. Procedía la supresión de la evidencia obtenida.

Por los fundamentos antes expuestos, *se revoca la sentencia dictada por el tribunal de instancia.*

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General Interino. El Juez Asociado Señor Negrón García disiente con opinión escrita, a la cual se une la Juez Asociada Señora Naveira de Rodón. Los Jueces Asociados Señores Rebollo López y Ortiz concurren sin opinión escrita. El Juez Presidente Señor Pons Núñez no intervino.

(*Fdo.*) Heriberto Pérez Ruiz
*Secretario General Interino*

—O—

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une la Juez Asociada Señora Naveira de Rodón.

Ante el Tribunal Superior, Sala de Guayama, Roberto Castro Santiago y Marcial Santiago Centeno (c/p "Mulato")

fueron acusados del delito de escalamiento agravado. Se les imputó que en la noche de 22 al 23 de diciembre de 1986, "ilegal, voluntaria y maliciosamente, mientras actuaban en concierto y de común acuerdo, penetraron al edificio Centro de Cuidad[o] Diurn[o] de Servicios Sociales propiedad del Estado Libre Asociado de Puerto Rico, con la intención criminal de cometer, como cometieron[,] un delito de [a]propiación [i]legal". Como agravantes, el Ministerio Fiscal adujo que forzaron su entrada para penetrar al interior de dicho edificio —propiedad del Estado— en horas de la noche.

Por tribunal de derecho, fueron hallados culpables de apropiación ilegal agravada (Hon. Francisco A. Padilla, Juez) y sentenciados a seis (6) años de reclusión.

En apelación, cuestionan la suficiencia de la prueba y la legalidad del arresto y registro. No tienen razón.

## I

El análisis integral de los hechos según la prueba desfilada, de carácter directo y circunstancial, permite concluir sin dudas que las observaciones personales e inferencias del policía Héctor Torres Texidor —en la sucesión de eventos e incidentes que acaecieron— configuraron suficientes motivos fundados para arrestar, registrar y encauzar válidamente al coapelante Roberto Castro Santiago y, subsiguientemente, a su compañero coautor Marcial Santiago Centeno. Expongámoslos.

Torres Texidor, en compañía de otro agente, patrullaba un sector de la ciudad de Guayama en un vehículo oficial rotulado. Durante la madrugada de 23 de diciembre de 1987, aproximadamente a las 3:15 A.M., vio a Castro Santiago en unión a Santiago Centeno. Ambos caminaban cerca del área de la plaza de mercado. Al notar su presencia, Torres Texidor —quien llevaba prestando servicios en la ciudad catorce (14) años, y antes nunca los había visto— comentó a su compañero que tenían "clientes". Los observó por varios mi-

nutos. Continuaron sus rondas. Después volvió a verlos dentro de la Panadería Díaz en la Calle McArthur. Ambos compraron una (1) libra de pan, mantequilla, algo de jamón picado y dos (2) pocillos. De un total de $1.23 pagaron únicamente $1.20, pues no tenían más dinero. En esa ocasión, el agente Torres Texidor conversó con ellos. Luego todos se marcharon.

Posteriormente los observó comiendo cerca de la Farmacia Myrna. Los agentes siguieron dando rondas. Al retornar de una, Torres Texidor *vio* a Marcial Santiago solo, leyendo *El Vocero de Puerto Rico*, al lado del Centro de Cuidado Diurno de Servicios Sociales situado en la Calle Derkes. Según su testimonio, ello le estuvo "raro" y le preguntó por Castro Santiago. E.N.P., pág. 3. Marcial Santiago le contestó que estaba en la Panadería Díaz y, además, le pidió un cigarrillo. El policía se lo negó, pues no fumaba. Ante este comportamiento sospechoso, el agente Torres Texidor optó por virar e ir a la panadería. Allí comprobó que Castro Santiago no estaba. En vista de esa situación regresó, y cuando pasaba de nuevo por la Farmacia Myrna, vio a Marcial Santiago que se marchaba corriendo. "En eso mira por el espejo retrovisor y ve al acusado Roberto Castro que *está saliendo por la puerta del Centro de Cuidado Diurno*." (Énfasis suplido.) Íd. Para evitar que también se fuera corriendo —igual que lo había hecho Marcial Santiago— lo fue "entreteniendo", esto es, le dio una oportunidad en lo que estacionaba el vehículo y se situaba a su lado. Inmediatamente después lo arrestó. Previo a las advertencias legales, lo registró y encontró un perfume marca "Avon", tipo muestra de representante. Lo condujo al cuartel local. Allí lo mantuvo como dos horas y media (2½) hasta que se recibió una querella expositiva de que el Centro de Cuidado Diurno había sido escalado. Mientras tomaba las generales de Marcial San-

tiago, fue informado(¹) que el compañero de Castro Santiago era Santiago Centeno ("Mulato"), de Salinas, que era "un pillo del diablo". E.N.P., pág. 3. Con esa información adicional, notificó al Cuartel de Salinas. Marcial Santiago fue oportunamente arrestado.(²)

La querella presentada aproximadamente a las 7:30 A.M. fue en el sentido de que esa noche el Centro de Cuidado Diurno había sido escalado. Una ventana fue rota y fueron hurtados una grabadora, una sumadora, un proyector, un pote grande de jugo de china, dos (2) relojes despertadores y un reloj digital. Además, se sustrajeron cuatro (4) perfumes y una (1) camisa de hombre, que eran regalos para intercambio entre los compañeros del centro.

Estos bienes fueron identificados por la testigo Luz D. Santiago. El perfume Avon ocupado a Castro Santiago era uno de los hurtados, desprovisto de su envoltura de regalo original. E.N.P., pág. 6.

## II

De entrada es menester exponer varios principios elementales. *Primero*, reconocer que una de las funciones principales de la Policía es prevenir el delito, esto es, evitarlo. "La Policía de Puerto Rico, en protección de la ciudadanía en general, tiene perfecto derecho a patrullar las vías públicas de nuestro país." *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 144 (1985). El patrullaje motorizado o peatonal es un medio tradicional aceptado. Ese patrullaje lógicamente implica que

---

(¹) Según la exposición narrativa de la prueba, en el directo, el agente Héctor Torres Texidor indicó que fue un policía el que le suministró esa información. E.N.P., pág. 3. En el contrainterrogatorio aclaró que "fue un muchacho no un agente, un tal Ortiz, quien no presenció los hechos, ni tampoco los había visto esa noche". Íd., pág. 5.

(²) En su alegato consigna que fue arrestado cuatro (4) días después. Alegato del apelante, pág. 11. De la exposición narrativa enmendada de la prueba, o autos originales, no hemos podido corroborar ese aserto.

los agentes de la Policía deben estar alertos y vigilantes. A ello respondía el tipo de patrullaje nocturno del agente Torres Texidor. El descargo legítimo de esa encomienda pública, naturalmente, conlleva un ánimo prevenido de parte de la Policía para detectar situaciones y conducta poco usual, rara y de índole sospechosa. Los agentes pueden lícitamente hacer uso de toda la experiencia y conocimientos particulares que poseen del área y las personas, y del comportamiento humano tipificador de la conducta aparentemente criminosa, tanto en circunstancias repetitivas como las peculiares diferenciadoras. La importancia de esta suscinta dinámica es crucial para toda adjudicación judicial. Después de todo, los hechos determinan el derecho y la legitimidad de toda intervención policíaca; no a la inversa. *Segundo*, la Regla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, autoriza el arresto por un funcionario del orden público sin orden judicial cuando: (1) se haya cometido un delito en su presencia; (2) la persona arrestada hubiese cometido un delito grave, aunque no en su presencia, y (3) tuviese *motivos fundados* para *creer* que la persona ha cometido un delito grave.

Desde hace tiempo, nuestra casuística ha ido definiendo el concepto "motivos fundados". Así, hemos resuelto que:

> Pretender que el policía sólo pueda arrestar cuando se ha cometido un delito en vez de cuando tuviera motivos fundados para creer que se ha cometido, prácticamente quiere decir que los policías tendrían que ser magistrados y tendrían que celebrar un juicio para ver si se ha cometido el delito o no y, en caso afirmativo, entonces proceder al arresto. Es patente lo absurdo de esta posición. Es claro que la determinación de si se cometió un delito o no, no corresponde hacerla ni al policía ni a la persona que va a ser arrestada, sino que corresponde hacerla, en su día y mediante el debido proceso de ley, a un tribunal de justicia. La sociedad civilizada sobrevive predicada en la norma de que los individuos no se tomarán la justicia por su mano. *Cepero Rivera v. Tribunal Superior*, 93 D.P.R. 245, 248 (1966).

Como resultado de esta concepción, los tribunales nos abstenemos de imponerle a la Policía del país normas férreas no previstas en la Constitución, de cuestionable valor práctico, que restringen innecesariamente la prevensión y persecución del crimen. A fin de cuentas, según nuestra Ley Fundamental el concepto de *motivos fundados* no es teórico ni abstracto, sino esencialmente pragmático y circunstancial. No es producto de un examen o experimento a posteriori en un laboratorio aséptico, o de la discusión en el aula académica, desprovisto de la fragilidad y maldad que inherentemente forma parte de la condición humana y que lleva a algunos a delinquir. Al juzgar los jueces su aplicación, hemos de evaluar las razones del policía desde una perspectiva integral y realista, tomando en cuenta ese conocimiento especializado y reconociendo que muchas veces la comisión de un delito se entremezcla con actos o conducta de su faz inocentes, que no son otra cosa que el ropaje que cubre la maldad. Estas razones han de ser suficientes, eficaces y prudencialmente convincentes. Por ende, el análisis judicial sobre motivos fundados excluye certeza matemática y menos, en esa etapa extrajudicial, evidencia de absoluta culpabilidad. *Cepero Rivera v. Tribunal Superior*, supra. "Creer", según el mandato de la Regla 11 de Procedimiento Criminal, *supra*, realmente significa "[t]*ener por cierta una cosa* que el entendimiento no alcanza o *que no está comprobada o demostrada*". (Énfasis suplido.) *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. I, pág. 395.

Recapitulando, en "'nuestra jurisprudencia ha cristalizado el enfoque que "un funcionario de[l] orden público puede efectuar un arresto sin la orden correspondiente, entre otros casos, cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave, independientemente de que dicho delito se hubiese cometido o no en realidad. Regla 11 de Procedimiento Crimi-

nal de Puerto Rico, 2 *Práctica Forense*, pág. 20 (1964). La jurisprudencia enmarca el concepto de 'motivo fundado' en la posesión de aquella información y conocimiento que lleven a una persona ordinaria y prudente a creer que el arrestado ha cometido delito. *Pueblo* v. *Cabrera Cepeda*, 92 D.P.R. 70, 74 (1965); *Cepero Rivera* v. *Tribunal Superior*, 93 D.P.R. 245, 248 (1966). La conducta del funcionario público se juzga pues en orden al criterio de la persona prudente y razonable, por lo que es necesario considerar las circunstancias específicas del arresto para determinar su validez". *Pueblo* v. *Alcalá Fernández*, 109 D.P.R. 326, 331–332 (1980); *Pueblo* v. *Lafontaine Álvarez*, 98 D.P.R. 75, 81 (1969)'". (Énfasis omitido.) *Pueblo v. Martínez Torres*, 120 D.P.R. 496, 515 (1988), opinión disidente del Juez Asociado Señor Negrón García.

## III

La aplicación de esta doctrina al caso de autos pone de manifiesto que la intervención del agente de la Policía Torres Texidor fue justificada, legítima y razonable, acorde con la fluidez situacional peculiar que confrontó. La prueba antes reseñada e inferencias razonables —a base del análisis tripartita de circunstancias prospectivas, concomitantes y retrospectivas, *Pueblo v. Ortiz Rodríguez*, 100 D.P.R. 972, 979 (1972)—[3] es más que suficiente para sostener las convicciones.

Ciertamente, a las 3:00 de la madrugada —todavía de noche— la errática conducta de los apelantes Castro Santiago

---

[3] Allí indicamos lo siguiente:

"(a) circunstancias *prospectivas*: hechos anteriores al crimen y que apuntan hacia su futura comisión (motivo, plan, preparativos, etc.);

"(b) circunstancias *concomitantes*: hechos simultáneos al crimen que permiten que se lleve a cabo por el acusado (presencia en el lugar del crimen, acceso a la víctima, etc.);

"(c) circunstancias *retrospectivas*: hechos posteriores al crimen que sugieren que el acusado lo cometió (fuga, ocultación de evidencia, etc.)."

y Santiago Centeno generó inicialmente una aprehensión justificada de parte del agente Torres Texidor. En su ánimo prevenido, ello levantó una sospecha razonable que ameritaba su atención y vigilancia. Ninguno de ellos residía ni eran vecinos del lugar. La decisión del agente Torres Texidor de vigilarlos fue legítima y acorde con su responsabilidad de la tarea de patrullaje preventivo. Lo hizo fundamentado en la conducta rara de ellos, en consideración de la hora y el sitio. Para esa vigilancia no necesitaba tener motivos fundados. Después notó que se habían separado. Al investigar esa separación, el agente Torres Texidor confirmó que Santiago Centeno le había *mentido* al decirle que Castro Santiago estaba en la Panadería Díaz. Esa contestación fortaleció su ánimo prevenido inicial. Así, al regresar y ver inexplicablemente que Santiago Centeno se alejaba corriendo solo, la sospecha fundada se convirtió en motivos fundados para creer que ambos estaban en una empresa delictiva. Esta apreciación culminó, sin margen de dudas o interpretación, en motivos fundados cuando vio a Castro Santiago saliendo por la puerta del Centro de Cuidado Diurno.

No es necesaria mucha elucidación. La denominación "diurno" de la oficina de Servicios Sociales es clave y determinante. Ciertamente a esa hora de la noche estaba cerrada, sin sus funcionarios y completamente desocupada. Allí no se prestaba ningún servicio nocturno que justificara la entrada de Castro Santiago. ¿Cómo entonces negar validez a ese conocimiento directo del agente? Ante la conducta previa de Castro Santiago y Santiago Centeno —la mentira de éste y su huida— ¿fue irrazonable de parte del agente que procediera a arrestar al primero válidamente? A base de la rapidez en que acaecieron los hechos, ¿cómo imponerle al policía Torres Texidor la obligación de investigar previamente si había ocurrido algún escalamiento en el Centro de Cuidado Diurno antes de arrestar a Castro Santiago? Exigírselo, ¿no

era invitarlo a que huyera como lo hizo su compañero Santiago Centeno?

Las respuestas a estas interrogantes son evidentes. Insistimos, ¿qué justificación había a esa hora de la noche para que Castro Santiago hubiese penetrado en el Centro de Cuidado Diurno? Salvo que convirtiéramos este Tribunal en un laboratorio aséptico o aula académica, cualesquiera de sus integrantes, ¿no hubiésemos llegado a igual conclusión si, luego de observar idéntico comportamiento, viéramos a una persona extraña salir de la entrada de este recinto a las 3:15 A.M., esto es, de madrugada, todavía de noche? ¿Tacharíamos de irrazonable y carente de motivos fundados esa apreciación? Ni el espíritu judicial más liberal prevaleciente en este recinto puede descartar toda esta evidencia.

En buena hermenéutica y lógica rechazamos ese curso decisorio. La evidencia directa y circunstancial que en la fluidez situacional de esa noche se acumuló culminó en la configuración de motivos fundados para que el agente Torres Texidor arrestara legalmente a Castro Santiago. No podemos adjudicar la legalidad de su intervención únicamente a base de actos —algunos de su faz inocentes (compra de comestibles e ingerirlos en la acera próxima)— sin tomar en cuenta la conducta errática, contradictoria, inexplicable y carente de sinceridad que apuntaba hacia otros actos criminosos menos inocentes. Sucesivamente se produjeron suficientes detalles que concatenadamente fortalecieron el ánimo prevenido del agente Torres Texidor.

Una vez realizado el arresto, incuestionablemente el registro fue legal y razonable independientemente de que el agente Torres Texidor desconociera la realidad del escalamiento previamente perpetrado. Ello era necesario en evitación de cualesquiera armas de fuego u objetos que pudieran usarse y poner en peligro su vida e integridad corporal. *No podemos imponerle a los agentes del orden público que expongan torpemente y de ese modo sus vidas.*

El concepto constitucional *razonabilidad* no tiene ese alcance. *No es —ni debe ser— sinónimo de ingenuidad.* El registro fue coetáneo, incidental y razonable. Este último adjetivo "'viene del latín *"rationabilis"* que significa "arreglado, justo, conforme a razón. 2. ant. racional". *Diccionario de la Lengua Española, op. cit.*, T. II, pág. 1147. Como tal, es obrar con discernimiento. Versa sobre realidades eminentemente pragmáticas, de carácter relativo y flexible. No es estático. En diferentes épocas y momentos conlleva variados significados y grados. Se puede dar sobre situaciones inesperadas, más o menos imperiosas y urgentes, en que la libertad y curso de acción para actuar de diversos modos se reduce notablemente. Lo razonable descansa en lo moderado, en la cautela, prudencia, en la acción u omisión. Por ende, la variabilidad en el comportamiento del ser humano involucrado en todo acto criminoso y los distintos trasfondos del acto (sitio, hora, personas, edades y naturaleza y gravedad) son factores pertinentes para evaluar la razonabilidad de un registro y allanamiento hecho sin orden judicial'". *Pueblo v. Martínez Torres*, supra, pág. 515.

En última instancia, "la Policía de Puerto Rico, al válidamente arrestar a un ciudadano, tiene derecho a someter a la persona arrestada a un 'cacheo' o registro superficial antes de conducirlo del lugar en que éste es arrestado a la presencia de un magistrado. Sobre ello no debe haber duda. *Pueblo v. Costoso Caballero*, ante, pág. 150. Dicho curso de acción resulta necesario no sólo en protección de la vida y seguridad del funcionario que efectúa el arresto, sino de todas aquellas personas presentes en el tribunal a donde se conduce el arrestado". (Énfasis y escolio omitidos.) *Pueblo v. Zayas Fernández*, 120 D.P.R. 158, 165 (1987).

## IV

La prueba desfilada demostró el carácter de coautor de Santiago Centeno en la empresa criminosa. Que éste no pu-

diera ser arrestado en el lugar de los hechos debido a que huyó, no milita en contra.

Según el Art. 35 del Código Penal, 33 L.P.R.A. sec. 3172, son coautores de un delito, entre otros, los que toman parte directa, planifican o cooperan de cualquier modo en su comisión. *Pueblo v. Santos Ortiz*, 104 D.P.R. 115 (1975); *Pueblo v. Lucret Quiñones*, 111 D.P.R. 716 (1981). Esta cooperación o planificación implica participación intencional. *Pueblo v. Stevenson Colón*, 113 D.P.R. 634 (1982). Hay que demostrarla más allá de duda razonable. *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1974).

Sin embargo, preciso es recordar que "[p]or ser un elemento subjetivo la prueba sobre concierto y común acuerdo o designio común, de ordinario, *consiste de prueba circunstancial. Cf. Pueblo* v. *Torres*, 81 D.P.R. 678 (1960); *Pueblo* v. *Soriano Rodríguez*, 92 D.P.R. 46 (1965), en cuanto a prueba respecto a la 'intención criminal' ". (Énfasis suplido.) *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 146 esc. 7 (1985). En este mismo caso expresamos:

> Sabido es que la *"mera presencia* durante la comisión de un delito no es suficiente *por sí sola* para sostener una convicción, [citas], pero este hecho puede considerarse conjuntamente con las otras circunstancias que rodean el hecho delictivo a los fines de la determinación de responsabilidad, [cita]. No es indispensable, pues, que el acusado ejecute personalmente el acto delictivo y basta con su presencia pasiva, *siempre que su responsabilidad como co-autor puede establecerse* por actos *anteriores* o como el resultado de una conspiración en que participó, [citas], *o de un designio común*". (Énfasis suplido.) *Pueblo* v. *Aponte González*, 83 D.P.R. 511, 519–520 (1961). Debe mantenerse presente que el elemento de "concierto y común acuerdo o designio común", como cualquier otro hecho en controversia, puede ser establecido mediante prueba *indirecta o circunstancial, Pueblo* v. *Cancel Peraza*, 106 D.P.R. 28 (1977), *y que la evidencia circunstancial es intrínsecamente igual que la evidencia directa. Pueblo* v. *Sal-*

*gado Velázquez*, 93 D.P.R. 380 (1966). (Énfasis suplido y en el original.) *Pueblo v. Ortiz Martínez*, supra, pág. 145.

Desde el primer momento, Santiago Centeno exhibió una conducta sospechosa análoga a la de Castro Santiago. Los motivos fundados que finalmente ello generó validaron su arresto posterior. Recuérdese que le mintió deliberadamente al agente Torres Texidor y después huyó del lugar. Con anterioridad siempre estuvieron juntos. La única inferencia lógica de su falta de sinceridad es que fue con el propósito de confundir al agente Torres Texidor y ganar tiempo para Castro Santiago, que presumiblemente ya estaba dentro del Centro de Cuidado Diurno. Su huida impidió su arresto inmediato.[4] Como resolviéramos en *Pueblo v. Espinet Pagán*, 112 D.P.R. 531, 536–537 (1982):

> Ciertamente debemos evitar caer en la superficialidad de atribuirle a toda mente y conducta humana presunciones de un proceder automático. Hay delincuentes que realizan el acto delictivo a plena luz del día, sin ocultarse, y otros de manera contraria. Ante determinado reclamo policial pueden responder de distintas maneras: unos huyen; otros permanecen serenos con la mayor naturalidad; otros se desprenden, a como dé lugar, del material delictivo; otros espontáneamente admiten sin reservas sus actuaciones, etc. La dinámica de la conducta delictiva, aunque diferente en sus protagonistas, medios y en un sinnúmero de circunstancias, presenta en el fondo características básicas comunes. Lo importante es detectar cuándo esas discrepancias, producto de las diferencias humanas, están presentes en determinada actuación. Con esta perspectiva en mente es que hemos evaluado el testimonio de los agentes en este caso.

---

[4] Adviértase que el tamaño físico de alguna de la mercancía sustraída era pequeño y, por ende, susceptible de ser transportada —parcial o totalmente— por una persona sin mucha dificultad ni necesariamente en sus manos.

La circunstancia de que los agentes no encontraron otros objetos sustraídos y la omisión de no indagar primero en el Centro de Cuidado Diurno, si la puerta estaba o no forzada, desmerecen su credibilidad. Máxime ante la evidencia incuestionable de que se realizó el escalamiento forzando una ventana (enfoque retrospectivo).

Una nota cautelar. Desde este estrado apelativo no podemos livianamente descartar toda la información y el conocimiento que el agente Torres Texidor poseía del sector,[5] adquirió esa noche y atestó ante el tribunal de instancia. Dicho foro aquilató y dio entero crédito a su declaración. "El Tribunal Supremo de Puerto Rico es uno de apelación que no debe anular el criterio del juez de instancia, en superior posición para adjudicar credibilidad, cuando el récord descubre una cabal observancia del debido proceso de ley. No estamos aquí para sentarnos como juez de primera instancia en un nuevo juicio del acusado." *Pueblo v. Santiago Sánchez*, 111 D.P.R. 379, 390 (1981).

## V

Finalmente, aunque no se elabora adecuadamente, en las circunstancias de autos carece de todo mérito alegar que era necesaria la celebración de una vista de confrontación para Santiago Centeno. En primer lugar, no se cuestiona que el agente Torres Texidor tuvo amplias oportunidades y tiempo suficiente para apreciar bien su físico —y el de Castro Santiago— al extremo de que conversó con él en la Panadería Díaz. Después, en sus sucesivas rondas, lo observó y finalmente le habló poco antes de que huyera. En segundo lugar, no existe evidencia que tienda a sugerir que estamos realmente frente a un problema de identificación, antes ni durante el juicio. *Pueblo v. Rey Marrero*, 109 D.P.R. 739 (1980). Menos, de sugestibilidad.

Si asumimos que su arresto fue realizado cuatro (4) días después —aserto en el alegato y no en la exposición narrativa certificada— ello no activaba necesariamente el requisito de una rueda de confrontación. La percepción que de su

---

[5] Explicó que en sus catorce (14) años nunca había visto a Roberto Castro Santiago y a Marcial Santiago Centeno por el lugar. Debido a la hora, indicó que había poca gente; por lo regular, los basureros en sus gestiones de limpieza.

persona incontrovertidamente tuvo el agente Torres Texidor no quedó desvanecida por esa omisión. No estamos ante un caso de confusión, difícil percepción, recuerdo tenue, transcurso extremo de tiempo o inseguridad de testigo. *Pueblo v. Rodríguez Maysonet*, 119 D.P.R. 302 (1987); *Pueblo v. Mattei Torres*, 121 D.P.R. 600 (1988).

Por los fundamentos expuestos, disentimos. Confirmaríamos las sentencias.